# Illinois Official Reports

## Appellate Court

---

### *People v. Kindle*, 2021 IL App (1st) 190484

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DONNTE KINDLE, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>No. 1-19-0484 |
| Filed | September 17, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-19826(02); the Hon. Kenneth J. Wadas, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Douglas R. Hoff, and S. Emily Hartman, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (John E. Nowak, Enrique Abraham, Jon J. Walters, and Victoria L. Kennedy, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Justices Connors and Mikva concurred in the judgment and opinion. |

**OPINION**

¶ 1      Defendant, Donnte Kindle,[1] appeals his conviction after a jury trial of first degree murder and his sentence of 28 years' imprisonment. On appeal, defendant contends (1) the State failed to prove him guilty beyond a reasonable doubt where the evidence identifying him as part of the group that attacked the victim was unreliable, (2) he was denied his right to a fair trial where the prosecutor repeatedly and improperly implied that witnesses were afraid to testify, (3) defense counsel was ineffective when she stated during opening argument that the jury would hear evidence that defendant did not participate in the attack but then failed to present any such evidence during trial, (4) the trial court failed to admonish potential jurors pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) whether they understood the principles enumerated in the rule, (5) he is entitled to a new sentencing hearing because he was 17 years old when he committed the offense and the trial court failed to consider the statutory factors listed in section 5-4.5-105(a) of the Unified Code of Corrections (730 ILCS 5/5-4.5-105(a) (West 2018)) for juvenile defendants, and (6) his mittimus should be corrected to reflect only one conviction and sentence for first degree murder. For the following reasons, we affirm defendant's conviction and sentence but order that the mittimus be corrected to show one conviction and sentence.

¶ 2                                          I. JURISDICTION

¶ 3      Defendant was sentenced on January 23, 2019. He filed his notice of appeal on February 14, 2019. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017), governing appeals from a final judgment of conviction in a criminal case entered below.

¶ 4                                          II. BACKGROUND

¶ 5      The State charged defendant and codefendants Jabril Garner and Antoine Ward with 12 counts premised on the beating death and robbery of Darius Chambers. Defendant and Garner were tried in separate but simultaneous jury trials in 2018. This court affirmed Garner's conviction in *People v. Garner*, 2021 IL App (1st) 182532-U. A fourth codefendant, Jonathan Primm, was convicted in a separate trial and sentenced to 40 years' imprisonment.

¶ 6      Stephen Willis testified that he was with Chambers on the night of October 29, 2011. They went to a Halloween party and later that night walked to a bus stop on 79th Street and Greenwood Avenue. There was another bus stop across the street. Willis testified that there was a streetlight above their bus stop.

¶ 7      While they waited, a man later identified as Ward walked up to the bus stop from a nearby apartment building and stood to the left of Chambers. After about five minutes, another man

---

[1]Although the certification of record pages name defendant as "Donte," other documents in the record, such as the charging instrument and the presentence investigation report (PSI), spell his name "Donnte." The parties on appeal also use this spelling. Therefore, we will refer to defendant as "Donnte."

later identified as Garner came and stood to the right of Willis. Shortly thereafter, two more men crossed the street and approached Willis and Chambers.

¶ 8 Garner asked to use Willis's cellphone, and Willis responded that he did not have one. Feeling uneasy, Willis gave Chambers "a look" to indicate they should leave "because this doesn't feel or look right." Ward then "swung" at Chambers, and Willis ran toward a friend's house nearby. When he arrived at his friend's house, he learned that police had been notified. Willis returned to 79th Street and Greenwood Avenue, where he saw Chambers on the ground with a sheet over him.

¶ 9 Chambers died from a brain hemorrhage resulting from blunt force injuries to his head. Later that day, Willis went to the police station to view a photo array and lineup. Willis identified Garner and Ward as two of the offenders.

¶ 10 Zachary Morris testified that he was driving near 79th Street and Greenwood Avenue late on October 29 into the early morning of October 30, 2011. While passing Greenwood Avenue, he saw a group of "at least four men possibly more" at a bus stop "jumping on another individual on the ground." The men jumped on the individual's head with both feet as if "busting a cherry open." They were also "kicking his tailbone *** trying to break his back." Morris observed the men going through the victim's pockets and "beating him up at the same time." At some point, the men scattered. Most went south on Greenwood across the street, while one "crossed over" Morris's car, "running with the rest of the guys down Greenwood." Morris called the police and he tried to give descriptions of the men, but their faces were covered.

¶ 11 Jalen Primm, who was 14 years old at the time of trial, testified he previously lived in Chicago in an apartment on Greenwood Avenue with his parents and siblings. Codefendant Johnathan Primm was his cousin. Around Halloween in 2011, when he was seven years old, he saw "something happen" outside his apartment. Something woke him up, and he looked out the window. Jalen saw a man on the ground "getting beat up" at the bus stop across the street. The man was on the ground getting kicked and punched. Jalen did not remember how many people were beating him up, but "all" the people he saw were kicking and punching him. His cousin was one of the men. While the man was being beaten, "[h]is friend" ran. Jalen could not recall who came to his house after the beating. He testified that his sister, Janilah, was there, and he believed his mother was asleep. He went back to sleep after seeing the beating.

¶ 12 Jalen acknowledged that he previously testified when he was seven years old but did not recall specifically that he testified before a grand jury in November 2011. He remembered being asked questions and answering questions. He did not recall previously identifying a photograph of defendant or testifying that he looked out of the kitchen window. He also did not recall that, after being asked what the men did after "they couldn't catch that man," he responded that defendant, Garner, Ward, and Primm returned to his house. Jalen acknowledged that he previously testified that Primm was kicking and punching the man and the four men returned to the house and started talking. He further acknowledged that he was shown four photographs and signed his name on them but did not know whether he signed them because he identified the men in them. He had previously identified Primm in one of the photographs.

¶ 13 Jalen also acknowledged that he testified at Primm's trial in January 2018, but he did not recall testifying that "four boys" were beating up the man or identifying them as defendant, Ward, Garner, and Primm. Further, he did not recall testifying that defendant and Garner were punching and kicking the man. Jalen did not recall testifying that the four men were at his

- 3 -

house prior to him going to sleep that day or that they returned after the beating. He remembered viewing lineups but could not remember identifying anyone. Jalen then remembered viewing a lineup and identifying Garner. He identified Primm in a lineup and Ward in a photograph array but denied identifying defendant. Jalen did not remember giving a recorded video statement to an assistant state's attorney (ASA) on November 1, 2011.

¶ 14    ASA Kelly Grekstas testified that, on November 1, 2011, she conducted a videotaped interview of Jalen, in the presence of his mother and Detective Watkins. Jalen stated that he lived in a house at 7910 South Greenwood Avenue with his mother, father, sisters, and brothers. On the night of October 30, 2011, he was at home with his sister, two brothers, and cousin. He looked out the window "to see if they was about to fight." Jalen explained that he could see the bus stop from his window and saw "two boys" standing there. Jalen did not know the "two boys." He also observed defendant, Primm, Garner, and Ward at the bus stop. Primm was Jalen's cousin, and Garner and Ward were friends of his brother Arnold Mitchell. Jalen stated that he did not really know defendant, but defendant had been in Jalen's house.

¶ 15    He stated that defendant, Primm, Garner, and Ward had been in the house prior to going outside. Jalen watched them go "across the street *** by the bus stop." When they approached the "two boys," one boy ran and the other boy stayed at the bus stop. Jalen stated that the boy who stayed "got beat up" and "[t]hey were stomping him and kicking him and punching him." Defendant, Primm, Ward, and Garner were all stomping and hitting the boy with "their hands and feet," as the boy was "laying down" on the ground. The four chased the other boy as he ran away but they were not able to catch him.

¶ 16    Afterwards Primm, Ward, and Garner came into the house and Primm started talking. After they finished talking, Jalen went into his sister's room where he fell asleep. He stated that on November 1, 2011, he went to the police station and identified defendant in a lineup.

¶ 17    Jalen's mother, Shannon Primm, testified that she was a witness at a previous trial and "as a result," the state's attorney's office assisted her with relocation outside of Illinois. The state's attorney's office gave her money to move and made travel arrangements for her and her children, Jalen and Jamirah, to come to court. Other than relocating and travel expenses, she was not promised anything or threatened in exchange for her testimony. Defense counsel objected to this testimony because it raised an inference that Shannon and her family moved out of state because they were afraid, which was untrue. The trial court overruled the objection.

¶ 18    In October 2011, Shannon lived on the 7900 block of Greenwood Avenue on the third level of the building with her then-husband Jeffrey Primm and her eight children. Their apartment had a front and back exit, and the living room window overlooked 79th Street. On the night in question, she was asleep but woke up when she heard her daughter Tatanisha talking to Jeffrey. Shannon looked out the window and saw a white sheet. She acknowledged that she previously testified in January 2018 that she learned from Tatanisha that a man was lying under the white sheet. Jeffrey had called the police. Shannon testified that when she woke up, she saw Primm and defendant sitting on the couch. No one else was in the house, but she had been sleeping and was unaware if anyone came or went. The police "took" Primm and defendant that night.

¶ 19    On November 2, 2011, Shannon found Chambers's identification card in her kitchen. She had never seen the person pictured in the identification. Upon finding the identification, Shannon called the police.

¶ 20    Janilah Primm testified she was 13 years old when the incident occurred. At the time, she lived in the Greenwood Avenue apartment with her parents, Shannon and Jeffrey, and her

siblings. In the early morning hours of October 30, 2011, her cousin Jonathan, Ward, Garner, and defendant were at the apartment. Ward and Garner were family friends, and Janilah had known defendant for about 1½ years.

¶ 21    While in her bedroom, Janilah heard Primm talking, and then she heard people leave the apartment. After about 10 minutes, she heard people come back to the apartment. She left her bedroom and saw Primm in the front room. Janilah testified that defendant, Ward, and Garner were in her brother Arnold Mitchell's room. When Janilah came out of her room, Arnold came out of his room behind her. Janilah "went straight looking through the house" and when she looked outside, she saw a body lying on the ground at the bus stop. Nothing obstructed her view of the body. She testified that her brother, Jalen, was awake at the time. Janilah called her sister, Tatanisha Mitchell, and her brother, Jabari Williams. After they came to the apartment, they woke up their parents. Janilah testified that she could not remember who was in the apartment when police arrived, but she "kn[ew] for sure that [Primm] was there and Donnte was there."

¶ 22    On cross-examination, Janilah testified that she did not wake her parents first because she did not want to interrupt their sleep with news of a dead body. She called her older sister and brother because they were mature and smart. She acknowledged that her older brother Arnold was in the house, but he did not wake their parents. Their father Jeffrey came out of the bedroom first, and he immediately called the police.

¶ 23    Arnold Mitchell testified that he was subpoenaed and not testifying voluntarily. He was best friends with Garner, and he knew defendant through Garner. Ward was a family friend, and Primm was his cousin. He identified both defendant and Garner in court. Mitchell was not friends with defendant and did not know him well.

¶ 24    On October 30, 2011, Mitchell and Ward tried to go to a Halloween party but were refused entry due to their age. They returned to Mitchell's home where they saw defendant, Garner, and Primm. Defendant was sitting on the couch in the living room with Garner, Primm, and Ward. Mitchell heard Primm say something, and then he went to sleep in his room. He awoke and noticed the apartment lights were off. When he went into the kitchen, he saw Janilah looking out the window. He looked out and saw a body on the ground. Nothing was blocking his view and the intersection was well lit. Mitchell then saw Primm and defendant enter the back door.

¶ 25    After he saw the body Mitchell went back to his room and fell asleep. He did not wake up until the police came to arrest defendant and Primm. Mitchell denied seeing Tatanisha or Jabari that night or seeing Janilah call them.

¶ 26    Mitchell acknowledged he testified before a grand jury in November 2011 that he saw Primm and defendant running toward the apartment and "a man laid out." He had also testified that he saw Jalen looking out of the window. Mitchell testified that there were never conversations with Jalen, Janilah, or their parents about what to say or who to blame for the attack.

¶ 27    Now-retired Chicago Police Detective Earl Parks was assigned to investigate Chambers's death. Parks called Willis into the police station to view a physical lineup around 9 a.m. on October 30, 2011. Willis could not identify either Primm or defendant and stated he could only identify the two who attacked him. Willis identified Garner and Ward in separate photo arrays. Parks then went to the Greenwood apartment to interview Mitchell, Jalen, and Janilah.

- 5 -

¶ 28    Detective Parks testified that when he initially tried to interview the younger people in the Primm household, they "were kind of reluctant to say anything. They were scared." Parks stated that he "talked to Tatanisha Mitchell briefly on the scene that night" but otherwise "there was no conversation because they didn't—they just didn't say anything." He interviewed the family again and then Jalen came with his mother Shannon to the station to view lineups. Shannon signed the lineup advisory form for Jalen. When asked whether Shannon tried to influence Jalen in the identification, Parks testified "not at all." However, he was presented with his testimony at Primm's trial, where he answered "yes" to the same question. Parks acknowledged that he gave that answer at the trial.

¶ 29    On October 31, 2011, Jalen viewed two separate physical lineups with Shannon present. Jalen identified defendant in one lineup and Garner in another. Jalen identified Primm and Ward in photo arrays and printed his name on the photos. On November 2, 2011, Jalen viewed a lineup and identified Ward. Willis also viewed a lineup and identified Ward that day.

¶ 30    Chief Medical Examiner Dr. Ponni Arunkumar reviewed Chambers's autopsy report and concluded that his cause of death was subarachnoid hemorrhage due to blunt force injuries to his head. The manner of death was homicide. Dr. Arunkumar testified that Chambers suffered a "deep scalp hemorrhage" in his left temporal area, caused by blunt force trauma, and bleeding in the brain at the base of the skull, which extended upwards around the side of the brain.

¶ 31    After closing arguments, the jury found defendant guilty of first degree murder. At the sentencing hearing, defense counsel filed a sentencing memorandum as a supplement to the PSI. Counsel stated that she would be "primarily relying on *** Miller and its progeny." The trial court responded, "[c]orrect, I'm going to apply that." Defense counsel argued that the court should impose the minimum sentence because:

> "[W]hat we would suggest to the Court *** this murder was not, in fact, caused directly by a [*sic*] evil heart by Mr. Kindle. He went out like I said as a stupid young kid with this group of newly found friends. The bad thing about that and it almost fits perfectly into the Miller and the progeny dealing with this is that I believe as police would say *** there is nothing wrong with a group of young boys but they do tend to do very stupid things.
>
> And in [a] group especially when you have a leader *** pushing forward, pushing forward what you have is a situation like this. Mr. Kindle has been in custody since 2011. And has been essentially a model prisoner in the department of corrections.
>
> The reason that this becomes, in fact, important for our memorandum is because that's one of the things that Miller looks to. Miller *** looks to the point of rehabilitation."

¶ 32    The State responded that the sentencing range is 20 to 60 years for first degree murder. Although defendant was not the ringleader, he actively participated in the "brazen violent attack." The State asked for more than the minimum sentence.

¶ 33    After argument, the trial court sentenced defendant to 28 years' imprisonment. Defendant filed this appeal.

¶ 34                                    III. ANALYSIS

¶ 35    Defendant first contends the State failed to prove beyond a reasonable doubt that he participated in the attack on Chambers. Defendant argues that the only evidence connecting

him to the attack was the prior statement of Jalen Primm, who claimed to have seen the attack at night from his apartment located across a vacant lot from the bus stop.

¶ 36    On a challenge to the sufficiency of the evidence, we must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. Davison*, 233 Ill. 2d 30, 43 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The State's burden of proof includes the identity of the offender. *People v. Lewis*, 165 Ill. 2d 305, 356 (1995). Positive testimony from a single witness can support a conviction "if the witness viewed the accused under circumstances permitting a positive identification." *People v. Slim*, 127 Ill. 2d 302, 307 (1989). "[I]dentification which is vague or doubtful is insufficient to support a conviction." *Lewis*, 165 Ill. 2d at 356. We will not reverse a criminal conviction "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Givens*, 237 Ill. 2d 311, 334 (2010).

¶ 37    Courts consider the following factors when evaluating identification testimony: (1) the opportunity to view the offender at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) how certain the witness is of the identification; and (5) the length of time between the crime and the identification. *Slim*, 127 Ill. 2d at 307-08. However, no single factor is conclusive in establishing the reliability of identification testimony. *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 47. Instead, courts evaluate the reliability of an identification based on the totality of the circumstances. *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 89.

¶ 38    Approximately two days after the attack, Jalen gave a statement saying that he observed the attack from the window of his apartment. Something woke him up, and he looked out the window "to see if they was about to fight." Jalen observed the entire occurrence, from the time the attackers approached the "two boys" at the bus stop to when Willis ran away and the attackers tried to chase him down. Jalen's viewing of this violent occurrence from his apartment, where he did not fear for his safety, likely increased his powers of observation. See *People v. Robinson*, 206 Ill. App. 3d 1046, 1052 (1990) (finding that "[e]xcitement, rather than detract from an identification, could increase the powers to observe"). It is thus reasonable to conclude that Jalen's degree of attention was relatively high.

¶ 39    Defendant, however, contends that Jalen's identification was unreliable due to the distance from which he watched the fight, the fact that the attack happened at night, and because Jalen did not know defendant. We disagree. Although Jalen did not know defendant, defendant had come to Jalen's house prior to the attack so Jalen had ample opportunity to observe him. Jalen also consistently identified defendant as a participant in the attack soon after it occurred. While the distance from Jalen's apartment to the bus stop was approximately 180 feet, a streetlight was located directly above the bus stop. Janilah and Mitchell testified that they could see the area from their apartment because it was well lit and nothing obstructed their view. Testimony based on night observations, where the area was illuminated by artificial light, can serve as proof of identification beyond a reasonable doubt. *People v. Barnes*, 364 Ill. App. 3d 888, 894 (2006).

¶ 40    The reliability of Jalen's statements was also bolstered by the corroborative testimony of other witnesses concerning the details of the attack. See *People v. Gosier*, 145 Ill. 2d 127, 152 (1991) (finding other testimony that provided corroborative support rendered a child's statements "highly reliable"). Jalen stated that he saw "two boys" standing at the bus stop. He

watched defendant, Primm, Ward, and Garner go "across the street *** by the bus stop." When they approached the "two boys," one boy ran and the other boy stayed at the bus stop. Jalen stated that the boy who stayed "got beat up" and "[t]hey were stomping him and kicking him and punching him" with "their hands and feet" as the boy was "laying down" on the ground. The four chased the other boy as he ran away but they were not able to catch him. This testimony was corroborated by Willis, who testified that he and Chambers were at a bus stop when they were approached by a total of four men. One of them "swung" at Chambers, and Willis ran toward a friend's house nearby. Jalen's testimony was also corroborated by Morris, who testified that he was driving near 79th Street and Greenwood Avenue when he saw a group of "at least four men " at a bus stop "jumping on another individual on the ground." The men jumped on the individual's head with both feet as if "busting a cherry open." They were also "kicking his tailbone *** trying to break his back." He then saw them running down Greenwood. Janilah Primm and Arnold Mitchell testified, like Jalen, that defendant was at the house before and after the attack. Given the corroboration of Jalen's statements about the attack, and Jalen's high degree of attention when he observed the attack, we find that Jalen's identification testimony was reliable.

¶ 41    Defendant also questions Jalen's credibility as a witness, arguing that Jalen's mother and her family had other motivations in naming defendant. Defendant contends that it was Arnold Mitchell, not defendant, who participated in the attack. He argues that Detective Parks's testimony at another trial, where he stated that Shannon influenced Jalen during the police interviews, is proof that the Primm family was trying to protect Mitchell at defendant's expense. Defendant refers to this exchange between defense counsel and Parks at his trial:

"Q. Do you remember testifying in the Primm matter and being asked a question by an [*sic*] State's Attorney by the name of Maria Augustus?

A. Not particularly.

Q. Well, did you ask this—were you asked these questions and did you in fact give this answer ***.

* * *

Q. Did you ever see Sharon [*sic*] Primm attempt to influence Jalen in any way during this process, and your answer being yes?

A. I don't recall seeing…

Q. Did you—were you asked that question and did you give that answer?

A. If I—If I said yes, it would be for him to tell the truth.

Q. No, that's not the question I asked you. Were you asked by the Assistant State's Attorney during the trial of Mr. Primm and did you give that answer?

A. I don't recall

Q. So you don't recall?

A. I don't recall seeing—saying—

Q. Not that—

A. —that she would influence him.

Q. That's not the question I asked. You testified at the trial with Mr. Primm, correct?

A. Yes

Q. And were you asked this question: Did you ever see Sharon Primm, the mother, attempt to influence Jalen in any way during this process? And your answer being yes?

A. Well, like I said—

Q. Did you—

THE COURT: Did you give that answer?

DEFENSE COUNSEL: Did you answer that?

THE COURT: To that question on that date?

WITNESS: Yes."

¶ 42    Defendant also points to inconsistencies in the testimony of Janilah Primm and Mitchell regarding where the boys met in the apartment before the attack, how long the group was away from the apartment, and who was in the front room after the offense. He argues that "none of the three Primm/Mitchell family witnesses were consistent about where [he] allegedly was at within the apartment after the offense."

¶ 43    We are mindful that the jury heard this evidence, and it is the jury's duty to resolve inconsistencies and conflicts in the evidence. *People v. Tenney*, 205 Ill. 2d 411, 428 (2002). Based on its verdict, the jury resolved the inconsistencies and the issues regarding Jalen's testimony in favor of the State. The jury is not required to search out all possible explanations consistent with a defendant's innocence and raise them to a level of reasonable doubt. *People v. Campbell*, 146 Ill. 2d 363, 380 (1992). A reviewing court will not substitute its judgment for that of the fact finder on questions of witness credibility or in resolving inconsistencies in the evidence. *Id.*

¶ 44    For these reasons, we find that Jalen's identification testimony was sufficient to support defendant's conviction beyond a reasonable doubt. See *People v. Brooks*, 187 Ill. 2d 91, 130 (1999) (finding that the identification testimony of a single witness is sufficient to sustain a conviction if the witness viewed defendant under circumstances permitting a positive identification).

¶ 45    Defendant next contends that he was denied his right to a fair trial when the prosecutor repeatedly implied that witnesses were afraid to testify or changed their testimony out of fear, but no evidence was presented that defendant threatened anyone. Defendant points to (1) Shannon Primm's testimony, elicited by the State, that she had testified at a previous trial and, as a result, her family had been relocated, (2) after the assistant state's attorney asked Shannon in a recording whether anyone threatened her family, she replied, "that's what I want to talk to you about," and (3) Detective Parks's testimony that when he initially tried to interview the younger people in the Primm household, they "were kind of reluctant to say anything. They were scared."

¶ 46    Prosecutorial comments suggesting that witnesses were afraid to testify because the defendant had threatened or intimidated them, when not based on evidence in the record, are highly inflammatory and prejudicial. *People v. Mullen*, 141 Ill. 2d 394, 405-06 (1990). The statements challenged by defendant, however, do not imply that he was the person who issued threats. Defendant was charged in the attack, along with three codefendants, and nothing in these statements implicitly or explicitly identified defendant. Shannon's first statement referred to her testimony at a codefendant's trial, and her second statement, which she made during the recording of Jalen's statement to the assistant state's attorney, was a general

statement that implicated no codefendant in particular. She also did not say that she was threatened.

¶ 47　　Furthermore, defense counsel's strategy at trial was to separate defendant from the others by emphasizing that he was new to the group and did not know them well. As a result, a statement attributed to the codefendants as a group may not have automatically included defendant in the eyes of the jury. Detective Parks's testimony that the "younger people in the household" were reluctant to speak with him because "[t]hey were scared" likewise did not implicate defendant directly. The statement itself also did not imply that anyone intimidated the witnesses into not talking. Rather, Parks's testimony could have referred to the witnesses' general fear immediately after the attack. It is reasonable that they would be scared after such an incident.

¶ 48　　However, as proof that the State improperly emphasized the witnesses' fear of him, defendant directs us to a letter written by a juror who was excused mid-trial. The juror stated:

> "I am writing this letter regarding my participation in this trial. It is my first time participating in something like this, and I was unsure what to expect. Participating in this trial has caused me a great deal of stress. I am a loving, caring, nurturing person, which is why I went on to become a nurse.
>
> I feel that I do not have the authority to decide whether someone is guilty or innocent. That is for god [*sic*] to decide, and I feel it goes against my beliefs.
>
> This case has grown beyond my capabilities. I did express my concerns to an officer the last two days and was encouraged to keep going. Unfortunately, the stress is building up and it is giving me a great anxiety. I am asking you to dismiss me from this case and relieve me from this distress.
>
> Additionally, if you do decide to dismiss me as a juror, I ask that you do not spell out my name. A simple search of my first and last name yields my address, age and phone number."

After the court read the letter in front of defense counsel and the assistant state's attorneys, defense counsel stated, "The only thing I would ask the Court to do *** I just ask the Court to ask her whether she conveyed her views." When asked by the court whether she conveyed her views to other members of the jury or if she kept it private, the juror answered, "I kept it private." The trial court dismissed the juror.

¶ 49　　The trial court found that the juror was distressed because she did not believe she had the authority to decide if someone was guilty or innocent, and that "had nothing to do with fear." We agree with the trial court. Defendant argues that the juror made her fear known in the last sentence where she asked the court not to release her name because "[a] simple search of my first and last name yields my address, age and phone number." We note, however, that there are reasons other than a fear of defendant for the juror to keep her personal information private. Importantly, none of the remaining jurors expressed fear due to their participation in the case.

¶ 50　　Defendant also points to the prosecutor's statements during closing argument that when testifying before a grand jury, "you don't have to sit in the same room as somebody who the last time you saw them they were beating someone to death at a bus stop," and "[m]aybe people get scared when they are sitting in the same room with a murderer." However, the rule against statements of defendant intimidation "concerns accusations that the defendant (or another on their behalf) intimidated the witness through some act apart from the offense at issue in the

case." *Id.* at 405. These statements do not imply that defendant did something after the attack to threaten witnesses. Instead, they suggest that a witness may find it inherently intimidating to testify against a person who committed the offense, which is not improper. *Id.* The State made no further mention of witnesses being scared, nor was it the focus of closing argument. We find no error here.

¶ 51 Defendant next contends that that his trial counsel was ineffective when she promised in her opening statement that the jury would hear testimony that defendant did not participate in the attack, but failed to present such evidence at trial. To prevail on his claim, defendant must show that (1) his attorney's performance fell below an object standard of reasonableness and (2) defendant was prejudiced by his attorney's deficient performance. *People v. Hodges*, 234 Ill. 2d 1, 17 (2009). The failure to satisfy either prong precludes a finding of ineffective assistance of counsel. *People v. Patterson*, 192 Ill. 2d 93, 107 (2000). Defendant must overcome a strong presumption that, under the circumstances, the challenged action or inaction was sound trial strategy. *People v. Lopez*, 371 Ill. App. 3d 920, 929 (2007).

¶ 52 In her opening statement, defense counsel told the jury that there were two bus stops where the attack occurred. One had a streetlight over it and the other did not. That night, defendant was with the group at Primm's house. Primm saw the men at the bus stop, and he and the others decided to go out and approach them. Counsel argued that defendant did not join them "because he didn't know them well enough." Instead, defendant went to the unlit bus stop across the street to go home. As he stood there, defendant saw something happening across the street. Counsel then states:

> "But you will hear what Mr. Kindle did do. In the bus stop he is watching and he sees something going wrong and he runs back to the house to the uncle of Primm, the stepfather of Mitchell, and he is saying call the police, do something.
>
> * * *
>
> He thought he did everything right. He thought he did everything correct. And yet he still winds up charged."

¶ 53 When counsel questioned Jalen on cross-examination, the following exchange occurred:

> "Q. You said you saw people beating up this man; correct?
>
> Yes.
>
> Q. And you said you saw people beating up this man? Right?
>
> A. Uh-huh.
>
> Q. Does that mean yes?
>
> A. Yes.
>
> Q. You saw another man out on the street? Right?
>
> A. Yes.
>
> Q. And that man according to what you are telling the jury today didn't start running until all four men were beating up on that man; correct?
>
> A. Yes."

On cross-examination, counsel also challenged the reliability of Jalen's identification testimony, given the circumstances of his observation, and suggested that Jalen was influenced by the motivations of his family.

¶ 54    The record shows that counsel did attempt to elicit testimony of another person at the scene to support the defense theory that defendant ran away and did not participate in the attack. Counsel, however, did not present any evidence to support this theory as promised in her opening statement. Instead, counsel appeared to have abandoned the theory at some point during the trial. In her closing argument, defense counsel focused on the fact that Jalen could not recall his identification of defendant when he was seven years old, and that no other eyewitness identified defendant. Counsel suggested it was Arnold Mitchell, Jalen's half-brother, who participated in the attack on Chambers while defendant ran back to Jalen's house for help.

¶ 55    Trial counsel's failure to provide testimony promised in opening statements is not ineffective assistance *per se*. *People v. Manning*, 334 Ill. App. 3d 882, 892 (2002). "[C]ounsel's decision to abandon a trial strategy during trial may be reasonable under the circumstances and *** the decision not to provide promised testimony may be warranted by unexpected events." *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 80. Nothing in the record here shows why counsel abandoned the theory she promised the jury in opening arguments. While ineffective assistance of counsel claims generally are reviewed on direct appeal, such claims may be better suited for collateral review under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)) if the record is incomplete or inadequate for resolving the claim. *People v. Bew*, 228 Ill. 2d 122, 135 (2008); *People v. Veach*, 2017 IL 120649, ¶ 46.

¶ 56    Since resolution of this issue depends on facts not in the record, we find that a collateral proceeding under the Act is a more suitable mechanism for addressing defendant's ineffective assistance of counsel claim. Defendant is not precluded from raising a claim on collateral review if resolution requires consideration of facts not in the record. *Veach*, 2017 IL 120649, ¶ 47. In a postconviction proceeding, the parties will have the opportunity to develop " ' "a factual record bearing precisely on the issue." ' " *Bew*, 228 Ill. 2d at 134 (quoting *Massaro v. United States*, 538 U.S. 500, 506 (2003), quoting *United States v. Griffin*, 699 F.2d 1102, 1109 (11th Cir. 1983)).

¶ 57    Defendant's next contention is that the trial court's admonishment to potential jurors violated Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) because the court did not ask whether they both understood and accepted the principles enumerated therein. Defendant concedes that he did not preserve this issue for review because he made no contemporaneous objection during *voir dire*. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve an issue for review, a defendant must object to the error at trial and raise the issue in a posttrial motion). He asks this court, however, to consider the issue as plain error. Plain error review is appropriate when (1) a clear error occurred and the evidence is closely balanced so "that the error alone severely threatened to tip the scales of justice against [the defendant]" "regardless of the seriousness of the error" or (2) a clear or obvious error occurred and that error is so serious that "it affected the fairness of the defendant's trial and challenged the integrity of the judicial process" "regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). The first step in plain error analysis is to determine whether there was a clear or obvious error. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 58    Rule 431(b) states:

     "The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be

convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her ***." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 59    Rule 431(b) requires the trial court to ask potential jurors whether they understand and accept the principles set forth and to provide each juror an opportunity to respond to specific questions regarding these principles. *People v. Thompson*, 238 Ill. 2d 598, 607 (2010). The trial court may conduct its questioning either individually or in a group, "but the rule requires an opportunity for a response from each prospective juror on their understanding and acceptance of those principles." *Id.*

¶ 60    Prior to jury selection, the trial court admonished potential jurors:

"It is absolutely essential as we select this jury that each of you understand and embrace this [*sic*] following principles: That is that all persons charged with a crime are presumed to be innocent and that it is the burden of the State who has brought the charges to prove the defendant guilty beyond a reasonable doubt. What this means is that the defendant has no obligation to testify in his own behalf or to call any witnesses in his defense. He may simply sit here and rely upon what he and his lawyers perceive to be the inability of the State to present sufficient evidence to meet their burden. Should that happen, you will have to decide the case on the basis of the evidence presented by the prosecution.

The fact that the defendant does not testify must not be considered by you in any way in arriving at your verdict. However, should the defendant elect to testify, or should his lawyers present witnesses in his behalf, you are to consider that evidence in the same manner and by the same standards as the evidence presented by the State's Attorneys. Bottom line, however, is that there's no burden upon the defendant to prove his innocence. It's the State's burden to prove him guilty beyond a reasonable doubt."

The trial court then addressed each panel of potential jurors: "The State has the burden of proof beyond a reasonable doubt. Do all four of you agree with and accept that proposition of law?" After the potential jurors answered, "Yes," the court continued: "The defense has no burden. He's presumed innocent. He doesn't have to testify. He doesn't have to call witnesses. And if he does not testify, you can't hold that against him. Do you agree with and accept those propositions of law?" The jurors answered, "Yes."

¶ 61    Defendant contends that the trial court violated Rule 431(b) where it did not specifically ask each panel whether they understood the principles and it stated that defendant did not have to present any *witnesses* instead of *evidence*. Defendant also takes issue with the trial court presenting the last three principles as a group when questioning potential jurors.

¶ 62    Recently, in *People v. Birge*, 2021 IL 125644, ¶ 34, our supreme court found that nothing in the plain language of Rule 431(b) requires "that the trial court recite the four principles separately." Rather, "it is the prospective jurors' understanding and acceptance of the bedrock principles that is essential to ensuring that the jurors are fair and impartial." *Id.* ¶ 41. Although the trial court below informed potential jurors that they must understand and accept the principles, it did not specifically ask them whether they understood and accepted the Rule 431(b) principles.

¶ 63      In *People v. Wilmington*, 2013 IL 112938, ¶ 28, the trial court admonished the entire group as did the court below, that " '[i]t is absolutely essential as we select this jury that each of you understand and embrace these fundamental principles.' " When it questioned small groups, however, the court only asked potential jurors if they accepted or disagreed with the principles. *Id.* ¶¶ 28-30. Our supreme court held that "the trial court's failure to ask jurors if they *understood* the four Rule 431(b) principles is error in and of itself." (Emphasis in original.) *Id.* ¶ 32. The trial court here, like the court in *Wilmington*, did not ask potential jurors whether they both understood and accepted the principles. It only asked whether the jurors agreed with and accepted them. Following *Wilmington*, we find that the court violated Rule 341(b).

¶ 64      We now must consider whether the error necessitates reversal. Defendant contends that reversal is required under the first prong of plain error analysis because the evidence in the case was closely balanced. When determining whether eyewitness testimony rendered the evidence "closely balanced," courts look at the same factors used to assess the reliability of eyewitness testimony that we have already considered. *Piatkowski*, 225 Ill. 2d at 567. For the reasons stated, we affirmed the jury's findings that Jalen was a credible witness and his identification testimony was reliable. We cannot say that the evidence was so closely balanced that the error alone may have tipped the scales of justice in favor of the State. Therefore, although the trial court committed error it was not reversible error.

¶ 65      Defendant's final argument is that the trial court failed to consider the factors in section 5-4.5-105 of the Unified Code of Corrections, applicable to juvenile defendants, when it sentenced him to 28 years in prison.

¶ 66      A trial court's sentence is accorded great deference. and a reviewing court will not reverse it absent an abuse of discretion. *People v. Butler*, 2013 IL App (1st) 120923, ¶ 30 (citing *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000)). "A sentence which falls within the statutory range is not an abuse of discretion unless it is manifestly disproportionate to the nature of the offense." *People v. Jackson*, 375 Ill. App. 3d 796, 800 (2007). In determining an appropriate sentence, the trial court considers such factors as "a defendant's history, character, and rehabilitative potential, along with the seriousness of the offense, the need to protect society, and the need for deterrence and punishment." *People v. Hernandez*, 319 Ill. App. 3d 520, 529 (2001).

¶ 67      Absent some affirmative indication to the contrary, other than the sentence itself, we presume the trial court considered all mitigating evidence before it. *People v. Jones*, 2014 IL App (1st) 120927, ¶ 55. Because the trial court, having observed the proceedings, is in the best position to weigh the relevant sentencing factors (*People v. Arze*, 2016 IL App (1st) 131959, ¶ 121), we do not substitute our judgment for that of the trial court simply because we would have balanced the appropriate sentencing factors differently (*People v. Alexander*, 239 Ill. 2d 205, 213 (2010)).

¶ 68      Defendant was sentenced to 28 years' imprisonment for first degree murder, which falls within the statutory sentencing range of 20 to 60 years. See 730 ILCS 5/5-4.5-20(a) (West 2018) (sentencing range for first degree murder). Thus, we presume his sentence was proper, absent some indication to the contrary. *People v. Burton*, 2015 IL App (1st) 131600, ¶ 36.

¶ 69      Defendant argues that the trial court abused its discretion in sentencing him because it did not consider all of the following mitigating factors required for juvenile defendants pursuant to section 5-4.5-105 of the Unified Code of Corrections:

"(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." 730 ILCS 5/5-4.5-105 (West 2016).

¶ 70    Defendant was 17 years old when the attack occurred. He contends that while the trial court explicitly stated it considered his age, impetuosity, and his level of maturity, the court did not mention the remaining factors in section 5-4.5-105. Defendant contends the court should have also considered that he had no criminal background, he was the youngest and new to the group, and he was not the ringleader making the decisions. However, other than the trial court's failure to mention or comment on the other factors, defendant points to nothing in the record affirmatively demonstrating that the court did not consider the relevant sentencing factors.

¶ 71    In fact, the record shows that the trial court considered the relevant statutory factors in aggravation and mitigation. The court had before it defendant's PSI, which addressed defendant's age, outside pressure and influences, family relationships and home environment, education, employment, and criminal background. Defense counsel also prepared a sentencing memorandum for the court in which she primarily relied on the concerns expressed in *Miller v. Alabama*, 567 U.S. 460 (2012), about sentencing juvenile defendants to life in prison. At the sentencing hearing, defense counsel argued that defendant went out that night "as a stupid young kid with this group of newly found friends." She argued that he was influenced by the leader of the group, whose case is pending. She also emphasized defendant's rehabilitation potential, arguing that he "has been essentially a model prisoner in the department of corrections."

¶ 72    The trial court acknowledged defendant's role of not being the ringleader and stated that "I am factoring that in. He is not getting 40 like the ringleader." The court further stated:

"I remember the facts clearly. *** It turned out to be a four on one beating, kicking, and stomping one [person] to death at the bus stop while he was trying to wait for a bus.

* * *

The—I have factored in and considered every single factor in aggravation and mitigation. I have gone actually above and beyond with respect to mitigation.

I agree with the defense on a great portion of the—their memorandum that mitigating factors pertaining to age, impetuosity, level of maturity at the time of the offense are all relevant. The defendant has no prior criminal background. He has another case pending but basically nothing in his background that would be of a [*sic*] aggravating factor.

The crime was brutal. The appropriate sentence in my view, however, even factoring in all the Miller factors, giving the defendant a chance for rehabilitation, and down the road an attempt to have a different life he is not entitled to a minimum sentence of 20 years.

I feel the appropriate sentence in this case is 28 years in the Illinois Department of Corrections with three years MSR."

¶ 73 When mitigating factors have been presented to the trial court, it is presumed that the court considered them absent some indication to the contrary. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19. We find no such indication here. Although the court did not specifically address every factor, it is not required to recite or assign a value to each mitigating and aggravating factor in the record. See *People v. Villalobos*, 2020 IL App (1st) 171512, ¶ 74 (finding that when considering the statutory factors in section 5-4.5-105, the trial court need not articulate each and every factor it considered in imposing a sentence). Accordingly, we find that the trial court did not abuse its discretion in sentencing defendant and affirm his sentence of 28 years' imprisonment.

¶ 74 Since we find that the trial court was presented with evidence of the sentencing factors contained in section 5-4.5-105, and it considered that evidence in imposing defendant's sentence, we need not consider defendant's claim that defense counsel was ineffective for stating that the statutory factors did not apply at his sentencing hearing. Whether or not counsel provided ineffective assistance, defendant was not prejudiced where the court nonetheless considered those statutory factors when it sentenced him.

¶ 75 Defendant also requests that the mittimus should be corrected to reflect only one conviction of first degree murder, instead of two convictions, and the State agrees. Pursuant to this court's authority, we order the mittimus corrected to indicated one conviction of first degree murder.

¶ 76 IV. CONCLUSION

¶ 77 For the foregoing reasons, we affirm defendant's conviction and sentence.

¶ 78 Affirmed.