2024 IL App (1st) 221224-U

No. 1-22-1224

Order filed June 14, 2024

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 15574 |
| | ) | |
| DESHAWN GARRETT, | ) | Honorable |
| | ) | Thaddeus L. Wilson, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE LYLE delivered the judgment of the court.
Presiding Justice Mitchell and Justice Navarro concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction and sentence is affirmed over his contentions that the State engaged in prosecutorial misconduct and that his sentence is excessive.

¶ 2    Following a jury trial, defendant DeShawn Garrett was found guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2016)) and sentenced to 55 years' imprisonment. On appeal, Mr. Garrett contends he was denied a fair trial when the State improperly argued, without evidence, that a key witness was afraid of him. He also argues that his sentence is excessive where the

minimum sentence of 45 years would provide adequate retribution yet still provide him the possibility of release at an age where he would be unlikely to reoffend. For the reasons that follow, we affirm Mr. Garrett's conviction and sentence.

¶ 3                                    BACKGROUND

¶ 4    Mr. Garrett was charged with six counts of first degree murder for the shooting death of Eric "E-Boy" Banks, two counts of attempted first degree murder of Tevin Clark, and one count of aggravated discharge of a firearm. Mr. Garrett was 19 years old at the time of the offense.

¶ 5    Prior to trial, Mr. Garrett filed a motion *in limine*, seeking to prohibit the State from entering into evidence or soliciting any testimonial evidence that any witness had "been threatened to change his/her testimony," as no evidence of any threats had been tendered to the defense. The State indicated it had no objection, stating, "At this point we do not have any evidence or any indication whatsoever that any of our witnesses are being threatened." The trial court granted the motion.

¶ 6    The State proceeded to trial on two counts of first degree murder and one count of attempted first degree murder. During opening statements, the State introduced its case, in relevant part, as follows:

"Now, I can't tell you what Dontrell Mitchell is going to tell you when he hits that stand here today and has to face his fellow gang member about what occurred on September 21st, 2016, but I can tell you he spoke with detectives, he gave an electronically-recorded statement, and you will learn of other sworn testimony that he gave identifying this Defendant as the person who shot and killed E-Boy, Eric Banks, on September 21st of 2016."

¶ 7    The State's first witness, Tevin Clark, testified that he and Mr. Banks, who went by the nickname "E-Boy," grew up together. Although neither of them was a gang member, Mr. Clark was friendly with members of the Gangster Disciples. He also knew of a gang called Money Over Bitches (MOB) and had heard about a gang known variously as Four Six Terror or Trigger Happy Family (THF).

¶ 8    Shortly before 2 p.m. on the day in question, Mr. Clark and Mr. Banks were walking to a neighborhood store. They spotted a friend's mother in a parked car and stopped to wish her a happy birthday. As they did so, Mr. Clark noticed a tan Buick sedan with tinted windows coming down the street. The driver's window was rolled halfway down. The driver looked at the two men, which allowed Mr. Clark to see his face. Then the door behind the driver opened and a man "looked right at [Mr. Clark], jumped out with a gun in his hand, and start[ed] shooting" at Mr. Clark and Mr. Banks. In court, Mr. Clark identified Mr. Garrett as the shooter.

¶ 9    In December 2016, detectives came to Mr. Clark's home and showed him a photo array. He made an identification of the shooter but told the police that he was not entirely sure. Specifically, he told the police, "[T]hat's him, but I want to see him in person." In court, he explained that he wanted to "make sure" it was the right person.

¶ 10    Also in December 2016, Mr. Clark saw a rap video on YouTube that had lyrics referencing Banks. He found the video after someone told him to "type in THF Westbrook" and "it popped up." Mr. Clark testified that the lyrics of the video included the words, "Don't get caught by the store like E-Boy." After the video was played in court, Mr. Clark stated that the shooter was one of the people depicted in the video, and a second person in the video "kind of" looked like the driver.

¶ 11 Following Mr. Clark's testimony, defense counsel made a motion for mistrial. Counsel argued that the State's opening "made an allusion to threats by gang members by saying that who knows what Dontrell Mitchell is going to say when he has to face his fellow gang member in the courtroom." Counsel further argued for a mistrial based on Mr. Clark's "now unsure identification" of Mr. Garrett in the photo array, stating, "This—prior to this, that has always been called a non-identification. The fact that it says slash unsure on the advisory form, I think, is not something that can be brought up by the State to the extent that they did." The trial court denied the motion.

¶ 12 Prior to Dontrell Mitchell taking the stand, defense counsel made a motion to bar him from testifying. Counsel stated that Mr. Mitchell was claiming to have received $10,000 in payments from the federal government "to snitch." Counsel argued that this claim was different from information that had been revealed during discovery. The State responded that it had disclosed to the defense an email from the State indicating Mr. Mitchell had received $600, and "that is all we have." The trial court denied Mr. Garrett's motion.

¶ 13 After Mr. Mitchell's testimony began, the State moved to *voir dire* Mr. Mitchell outside the presence of the jury regarding whether he would be invoking his fifth amendment right to remain silent. Following a discussion with the attorneys, the trial court stated it was granting the defense motion to bar Mr. Mitchell from testifying. The State then filed a motion to reconsider. Following another lengthy discussion, the trial court reversed its ruling barring Mr. Mitchell's testimony and ordered *voir dire*, during which Mr. Mitchell stated he planned to "plead the Fifth." Counsel was appointed for Mr. Mitchell and affirmed to the court that Mr. Mitchell planned to invoke the fifth amendment. After a recess and more discussion, the trial court granted Mr.

Mitchell the right not to testify and granted the State's subsequent motion for an order of use immunity.

¶ 14     Mitchell re-took the stand, identified Mr. Garrett in court, and stated that Mr. Garrett was his friend and went by the name "Gucci." He also stated that he knew Deonte Bowdry. Mr. Mitchell denied that he was with Mr. Garrett or Mr. Bowdry on September 21, 2016, and denied witnessing the shooting that took place that day or talking about it with Mr. Garrett. He also denied speaking with detectives about the shooting and denied having known who "E-boy" was at the time.

¶ 15     Mr. Mitchell initially denied speaking with an assistant state's attorney (ASA) at the police station in May 2017, but then acknowledged that he consented to having his statement to the ASA videotaped. Mr. Mitchell stated that he lied in the videotaped statement. When asked about numerous answers he gave to questions in the statement, he denied having made them. He acknowledged that the ASA showed him photographs. He admitted that he signed one of the photographs but denied signing or writing on the others.

¶ 16     Mr. Mitchell also denied having testified before a grand jury in September 2017, but then acknowledged that he had done so. He agreed that the ASA had asked him questions about his date of birth and what he was doing on September 21, 2016. However, when asked about the answers he gave to specific questions posed to him during his grand jury testimony, he denied having made them.

¶ 17     Mr. Mitchell agreed that he and Mr. Garrett created rap videos and posted them on YouTube. He also agreed that, in 2016, he was a member of the Four Six Terrors. He agreed that he spoke with Mr. Garrett's attorney and her investigator in 2021. He told them he wrote a song called "Bankroll" to "throw shade on Young Money," that "E-boy rolled with Young Money," and

that, in the video for the song, Mr. Garrett lip-synched the lyrics. He also told them that he made up the entire story he gave to the police and the grand jury because the police threatened to pin a murder on him, and that he was high and intoxicated.

¶ 18    On cross-examination, Mr. Mitchell agreed that he "lied to the ladies and gentlemen of the jury about a thousand times" during direct examination when he denied making statements that were recorded on video. He denied that the reason he "got away with lying" on direct examination was because he had been granted immunity. He stated the only reason he was in court was to tell the truth and that he did not care about immunity, as he was already incarcerated, and it did not matter if he got "more time for perjury."

¶ 19    Mr. Mitchell then denied having received money from "the Feds" for his story. He also denied that, when he was arrested in December 2016 for an unrelated offense, he started "singing about" various shootings. He eventually agreed that, after his December 2016 arrest, "the Feds" picked him up and he agreed to be activated as a confidential informant in exchange for $10,000. He agreed that he would meet with an agent named Craig Fries, and that every time they met, Mr. Fries gave him cash. Mr. Mitchell told him stories about Mr. Garrett and other people. Among other things, he told Mr. Fries that he was in the white minivan at the time of the Banks shooting, that the registration of the "gold Buick" was transferred so that it could no longer be connected to the original owner. After the shooting, he exited the minivan a few blocks from the scene and attempted to conceal two firearms.

¶ 20    Early in May 2017, Mr. Mitchell was questioned by detectives about a separate shooting. During that interrogation, he was also asked about the Banks shooting and shown the video footage of it. He identified Mr. Garrett as the shooter and stated he was in the car with him. He told the

detectives and an ASA that he was drunk and high at the time of the shooting and told the ASA he had blacked out. Mr. Mitchell also testified that he was intoxicated and high from ecstasy pills during his interview with the ASA. At the end of May 2017, Mr. Mitchell was arrested for an unrelated gun charge and charged with an earlier shooting. Mitchell agreed that "the Feds" deactivated him "because stiches [*sic*] can't go around shooting people." In September 2017, when he was brought before the grand jury, a detective told him he "had to say the same thing that [he] said the first time for [him] not to have nothing to do with it."

¶ 21    Mr. Mitchell agreed that the song on his YouTube video contained lyrics about 12 different dead people, including a line about "E-boy" dying by the store. When asked how he knew the location where E-boy was shot, he answered, "I mean how wouldn't I know" and explained that he had learned it on the street. He also explained that the song was a "drill rap" in which he included numerous names so that he would get "hits" on YouTube from gangs and get paid.

¶ 22    ASA Ronald Park testified that he and Chicago police detective Carol Maresso interviewed Mr. Mitchell on May 2, 2017. Mr. Mitchell indicated he was not under the influence of alcohol or drugs and did not appear to be so. He consented to have his statement video recorded. During the recorded interview, he viewed a number of photographs, identified the people in them, and wrote on them. Among other things, he wrote "shot at E-boy" on a photograph of Mr. Garrett and wrote "Gucci" on two screenshots from the video depicting the man in the gray hoodie. The video recording of Mr. Mitchell's interview was played for the jury.

¶ 23    In the interview, Mr. Mitchell related that he was the front-seat passenger of the tan sedan, which was driven by Deonte Bowdry. Mr. Garrett was in the back seat, and they were followed by people they knew in a white minivan. Mr. Garrett said, "There go E-Boy over there," exited the

sedan, and shot at two men on the sidewalk, one of whom fell to the ground. Mr. Garrett returned to the sedan, and they drove away. About two weeks later, when Mr. Mitchell asked Mr. Garrett why he shot Mr. Banks, he said he did not like him.

¶ 24 ASA Kathleen Conniff testified that on September 6, 2017, she met with Mr. Mitchell and two detectives in an interview room across the hall from the grand jury. There, she spoke with Mr. Mitchell for about 60 to 90 minutes and showed him photographs, the surveillance videos of the shooting, and the video of his statement to ASA Park. Mr. Mitchell indicated he was not under the influence of alcohol or drugs and did not appear to be so. He agreed to testify before the grand jury. His grand jury testimony was then read to the jury. During the grand jury testimony, Mr. Mitchell identified Mr. Garrett in screenshots from the surveillance videos of the shooting. He also stated that, a couple of weeks after the shooting, Mr. Bowdry had his car painted green. He then testified that his earlier, video-recorded statement was truthful.

¶ 25 Chicago police detective Kevin Kilroy then testified as a qualified expert in the field of criminal street gang investigations and intelligence. He stated that street gangs have rules, and the violation of which can result in the gang member being "violated, expelled from the gang, or even killed." Among these gang rules is the prohibition of testifying in court against other gang members.

¶ 26 Detective Kilroy explained that a gang called MOB, which stands for "Money Over Bitches," and a gang called THF, which stands for "Trigger Happy Family," were indirect rivals in 2016. According to Detective Kilroy, the intersection of West 57th Street and South State Street was in MOB territory. He testified that the YouTube video at issue featured, among other people, "THF Westbrook," who was Mr. Mitchell, and "Gucci de Menace," who was Mr. Garrett, and was

a song about dead rivals. He explained that "drill rap" was "music about retaliation." On cross-examination, he acknowledged that gang members would sometimes post YouTube videos falsely bragging and taking credit for crimes.

¶ 27 Outside the presence of the jury, the State indicated it was resting and the defense moved for a mistrial. Defense counsel stated, "Based upon the conversation I just had with Special Agent Scott Fries, there is a significant amount of outstanding discovery that was never tendered to me in this case." Specifically, defense counsel referenced a form that was completed when Mr. Mitchell was activated as a confidential informant containing "basic information" about him, a "suitability agreement," a deactivation form, and a closure form revealing when and how much he was paid. Counsel asserted that she would have used the information in the forms to cross-examine Mr. Mitchell. The trial court denied the motion.

¶ 28 Mr. Garrett called Professor Lance Williams, who was qualified to testify in the area of street gangs, youth violence, and pop culture. Dr. Williams testified as to the history of gangs in Chicago and their evolution toward neighborhood cliques with associated "rap teams" or "rap crews." He explained that "drill rap" began in Chicago when "Chief Keef," who was a childhood friend of Mr. Garrett, posted a YouTube video that got over 30 million views and led to a $6 million record deal. As the video was played in court, Dr. Williams explained that its lyrics referenced "a snitch he doesn't like, a fraud he doesn't like," but that "it's just—it's bravado." Chief Keef made another video in which he called out the name of a rival who had been killed, and inspired by Chief Keef's financial success, many young African American men wrote their own drill rap songs and posted them on social media.

¶ 29    On cross-examination, Dr. Williams confirmed that Chief Keef rapped about not liking snitches. The State asked, "Are you familiar with the term 'snitches get stitches'?" In response, Dr. Williams said that he was and explained that the phrase was "a colloquial meaning of snitches get hurt. If you snitch, you get hurt." When the State asked whether, in his experience, sometimes gang members did not want to come into court and testify against fellow gang members, Dr. Williams answered, "To be honest with you, I see more gang members testifying against their fellow gang members than not testifying."

¶ 30    Following Dr. Williams's testimony, Mr. Garrett made a third motion for mistrial based on the State's "insinuation that snitches get stitches." Counsel argued that, where there had been no evidence that Mr. Mitchell was threatened in any way to change his testimony, the State's "argument about snitches getting stitches was wholly inappropriate" and an attempt to prejudice the jury. The State answered that the inquiry about the phrase "snitches get stitches" was made because Dr. Williams had presented a Chief Keef rap with lyrics about snitches. The court asked defense counsel whether the topic of snitches had come up while Mr. Mitchell was on the stand. Counsel answered, "It came up that he was a snitch, I called him a snitch several times, but I never used the term 'snitches get stitches.'" The trial court denied the motion for mistrial, stating, "But also whether or not his testimony and possible explanation with respect to denying everything that was clearly on the video in terms of testimony, I think that was clearly invited." The court further stated that, even if the inquiry was not invited, it still believed the questions were proper.

¶ 31    During closing arguments, the State, among other things, noted that Mr. Clark identified Mr. Garrett as the shooter in a lineup. The State then made the following argument:

"Now, who else identified the defendant as the person who shot and killed Eric Banks and shot at Tevin? Dontrell Mitchell. Now, ladies and gentlemen, my [fellow ASA], last week in opening statements said that we weren't entirely sure what Dontrell would say when he got on that witness stand because despite what Lance Williams said, not many friends or same gang members want to come into court and testify against their own.

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled. This is argument.

[ASSISTANT STATE'S ATTORNEY]: So the law recognizes that. And they have created—here, best of friends here. Do you know how hard it was for Dontrell Mitchell to climb those stairs to get onto the witness stand? It is like climbing Mount Everest."

¶ 32    Following closing argument, defense counsel made a fourth motion for mistrial, this time based on the State's argument that not many gang members want to come into court and testify against other gang members. Counsel asserted that the State was implying threats had been made when there was no evidence of any threats. The trial court denied the motion.

¶ 33    The jury found Mr. Garrett not guilty of the attempted first-degree murder of Mr. Clark and guilty of the first degree murder of Mr. Banks while personally discharging a firearm that proximately caused death.

¶ 34    At sentencing, the trial court indicated it was in possession of an updated presentence investigation (PSI) report. Among other things, the PSI report reflected that Mr. Garrett had juvenile convictions for unlawful use of a weapon, aggravated robbery, robbery, aggravated battery, theft from person, attempted burglary, criminal damage to property, and a violation of conditions of probation. The PSI report also reflected that he denied ever belonging to a street

gang, worked for a produce company for three months in 2016, and reported having an excellent relationship with his fiancée and "very strong" personal and emotional support from his family members.

¶ 35    The State presented two witnesses in aggravation. Chicago police officer Jeffrey Reuter testified as to his December 26, 2016, arrest of Mr. Garrett pursuant to a warrant. Officer Reuter had conducted a traffic stop of a vehicle in which Mr. Garrett was a back-seat passenger and his partner recovered a loaded handgun "from where [Mr. Garrett] was directly seated from the floorboard underneath a hooded sweatshirt." During processing at the station, Mr. Garrett spontaneously said, "I could have shot back at you."

¶ 36    Cook County police investigator Adam Murphy testified that, on April 19, 2018, Mr. Garrett, while in the walkway between the jail and the courthouse, bit an officer's arm as the officer attempted to take an item from Mr. Garrett. Eventually, officers recovered a crumpled cup containing 24 pills from his hand.

¶ 37    In mitigation, the defense called Dr. Williams to testify concerning the pressures and influences Mr. Garrett faced in his childhood and teenage years. According to Dr. Williams, who had known Mr. Garrett for three years, Mr. Garrett's father was a high-ranking gang member and was incarcerated in Ohio when Mr. Garrett was around 11 years old. When he was 13 years old, a friend of his was "gunned down in his presence" coming home from school. Nevertheless, Dr. Williams ranked Mr. Garrett "probably in the top one to two percent of young men who have the potential to really go and do great things given the right opportunity."

¶ 38    Following the attorneys' arguments, the trial court confirmed that Mr. Garrett was 19 years old at the time of the shooting. It then commented that it found Dr. Williams's testimony and

writings to be intriguing and compelling. It also discussed brain development, observing that "[n]euroscience has established the brain continues to develop to mid to late 20's," and noting that entities such as insurance companies assessed risk differently for people under 25. The court then stated, "Being under age 25 and going through some of the same life experiences [Mr. Garrett] did *** does not, in my opinion, explain jumping out of a car upon seeing someone that they don't like or have a beef with and shooting them over and over and following and running behind them shooting." The court stated that the shooting "wasn't remotely a case of self-defense or mutual combat," but, rather, a "cold blooded" crime in which Mr. Garrett "didn't have to chase [Mr. Banks] and shoot[ ] him as he ran behind him constantly shooting."

¶ 39    After summarizing the facts of the case, the trial court stated it had considered the evidence at trial, the gravity of the offense, the PSI report, the financial impact of incarceration, the evidence and information and testimony in aggravation and mitigation, any substance abuse issues and treatment, Mr. Garrett's potential for rehabilitation, and the possibility of sentencing alternatives. The court further stated it had considered Mr. Garrett's age, impetuosity, and level of maturity at the time of the offense, as well as the following:

"the risk and consequences of behavior and presence of cognitive or developmental disability or both, if any, whether or not defendant was subjected to outside pressure including peer pressure, familial pressure or negative influence, the defendant's family, home environment, education and social background including any history of parental neglect, physical abuse or other childhood trauma, defendant's potential for rehabilitation or evidence of rehabilitation or both, the circumstances of the offense, defendant's degree

of participation and specific role of the offense including the level of planning by the defendant before the offense."

Finally, the court stated it had considered Mr. Garrett's prior juvenile history and whether he was able to meaningfully participate in his defense. The trial court imposed a sentence of 30 years for first degree murder plus 25 years for a firearm enhancement, for a total sentence of 55 years' imprisonment.

¶ 40    Mr. Garrett made a motion to reconsider sentence. The trial court denied the motion, stating as follows:

> "I thought long about this sentence. I really believe when you look at that video and I think justice would approve of the sentence, 65 years or more for Mr. Garrett and his conduct. I really considered despite his conduct in the jail, I considered his conduct here before the Court and how courteous and cooperative and the hopes that there is still something that could be made for him and his life whether it's in custody or later out of custody and that is how I arrived at what I believe was significantly lower sentence than he should receive. Motion to reconsider sentence denied."

Mr. Garrett now appeals.

¶ 41                                    ANALYSIS

¶ 42    We note that we have jurisdiction to consider this matter, as Mr. Garrett filed a timely notice of appeal. See Ill. S. Ct. R. 606 (eff. July 1, 2017). On appeal, Mr. Garrett contends that certain statements made by the State at trial amounted to prosecutorial misconduct. Specifically, Mr. Garrett challenges four statements made by the prosecution, arguing that the statements

improperly suggested Mr. Mitchell was threatened by Mr. Garrett. He also asserts his 55-year sentence was excessive.

¶ 43                           A. Prosecutorial Misconduct

¶ 44    Mr. Garrett contends he was denied a fair trial when the State argued, without evidence, that Mr. Mitchell was afraid of him. He asserts that the State, after assuring the trial court and the defense prior to trial that it would not suggest Mr. Mitchell had been threatened to change his testimony, "did precisely that." Mr. Garrett specifically challenges four statements made by the prosecution.

¶ 45    Mr. Garrett asserts that he preserved his arguments for appeal because he moved for a mistrial based on the State's opening statement, its injection of the phrase "snitches get stitches," and its closing statement, and included "this issue" in his posttrial motions. In the alternative, he requests this court address the merits of any forfeited aspects of his claim of prosecutorial misconduct under the first prong of the plain error doctrine or as ineffective assistance of trial counsel. The State maintains that Mr. Garrett's arguments regarding prosecutorial misconduct are procedurally defaulted. As to three of the four statements Mr. Garrett has identified on appeal, we agree.

¶ 46    It is well-settled that, in order to preserve an error for appellate review, a party must object at trial and include the issue in a written posttrial motion. *People v. Nelson*, 235 Ill. 2d 386, 436 (2009). Here, Mr. Garrett is challenging four statements made by the prosecution: one comment made by the State in opening statements, one question posed by the State during cross-examination of his expert witness, and two remarks made by the State in closing argument. Only one of these statements is not forfeited.

¶ 47   At trial, defense counsel objected to the State's remark in closing argument that "despite what Lance Williams said, not many friends or same gang members want to come into court and testify against their own." Defense counsel then included this issue in his amended posttrial motion, noting that the trial court overruled his objection. Accordingly, Mr. Garrett's challenge to this remark is preserved for appeal.

¶ 48   As to the other challenged statements, Mr. Garrett made no immediate objections but suggests that his various motions for mistrial preserved those issues for appeal. However, the motions for mistrial were not made contemporaneously with the remarks he is now challenging.

¶ 49   The first objection to the State's opening came when defense counsel moved for a mistrial after Mr. Clark had completed his testimony. Similarly, the first objection to the State's cross-examination of Dr. Williams regarding the phrase "snitches get stitches" occurred in a motion for mistrial made after Dr. Williams had been excused. Finally, counsel's motion for mistrial based on the State's closing argument—which did not even identify the comment about climbing onto the witness stand being as hard as climbing Mount Everest—was not made until after the jury had been instructed and had retired to deliberate. A motion for mistrial made in this delayed manner deprives the trial court of the ability to mitigate any error stemming from prosecutorial misconduct by sustaining an objection or instructing the jury to disregard a remark. *Nelson*, 235 Ill. 2d at 436-37. As such, Mr. Garrett's motions for mistrial do not constitute timely objections for purposes of preserving an error for appeal. *Id.* at 436. Thus, the alleged errors are forfeited.

¶ 50   We now move to a plain error analysis. Under the plain error doctrine, a reviewing court may consider an unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant,

regardless of the seriousness of the error; or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Whether forfeiture may be avoided under either of these theories requires us first to determine whether a clear error occurred. *People v. Garcia*, 2023 IL App (1st) 220524, ¶ 18.

¶ 51 A defendant has a right to a trial free from improper, prejudicial comments or arguments by the prosecution. *People v. Pasch*, 152 Ill. 2d 133, 184 (1992). Whether comments or arguments made by a prosecutor constitute prejudicial error is evaluated according to the language used, its relation to the evidence, and its effect on the defendant's right to a fair and impartial trial. *Id.* Prosecutors are allowed a great deal of latitude in making opening statements and closing arguments. *Id.* A prosecutor has the right to comment on the evidence and draw all legitimate inferences deducible therefrom, even if those inferences are unfavorable to the defendant. *Id.*

¶ 52 This court has applied, in different cases, both a *de novo* and an abuse-of-discretion standard when reviewing opening remarks by the State. *People v. Williams*, 2020 IL App (1st) 163417, ¶ 41 (listing examples). We have also acknowledged confusion regarding the applicable standard of review for claims of prosecutorial misconduct in closing argument, in light of "an apparent conflict" in supreme court precedent. *People v. Green*, 2017 IL App (1st) 152513, ¶¶ 78-79. In 2000, our supreme court stated that the trial court's determination of the propriety of remarks during closing argument "will not be disturbed absent a clear abuse of discretion." *People v. Blue*, 189 Ill. 2d 99, 128 (2000) (quoting *People v. Byron*, 164 Ill. 2d 279, 295 (1995)). However, in 2007, our supreme court subsequently stated that "[w]hether statements made by a prosecutor at

closing argument were so egregious that they warrant a new trial is a legal issue this court reviews *de novo*." *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007).

¶ 53    In this case, we need not decide upon the precise standard of review. We find that the challenged remarks did not constitute reversible error under either standard. See *People v. Cruz*, 2019 IL App (1st) 170886, ¶ 40 ("In this case, we would reach the same result under any standard of review."). We address the four remarks identified by Mr. Garrett in turn.

¶ 54    First, Mr. Garrett argues that it was improper for the prosecution to state in opening, "I can't tell you what Dontrell Mitchell is going to tell you when he hits that stand here today and has to face his fellow gang member about what occurred on September 21st, 2016[.]" He argues that the State's comments in opening unduly suggested that Mr. Mitchell had been threatened to change his testimony. He also contends that the State's "subsequent argument that [Mr. Mitchell] was scared to testify" was grossly improper because there was no evidence he was afraid of gang retaliation.

¶ 55    We do not view the statement to be improper, as the prosecution's statement was a fair assessment of Mr. Mitchell's unpredictability. Before opening statements were made, the defense filed a motion *in limine* previewing that a witness—identified by Mr. Garrett in his opening brief as Mr. Mitchell—may be changing his testimony. Once the trial was underway, Mr. Garrett filed another motion regarding Mr. Mitchell, this time to bar his testimony, reporting that Mr. Mitchell was claiming to have received $10,000 from the federal government "to snitch." The trial court denied the motion, later granted it, and subsequently reversed itself and ordered *voir dire*, during which Mr. Mitchell stated he planned to "plead the Fifth."

¶ 56    After the trial court granted a motion for an order of use immunity, Mr. Mitchell took the stand. He then denied all knowledge of the shooting and denied having testified before a grand jury or having made prior statements, including one captured on video. He also agreed that he lied to the jury "about a thousand times." Due to the chaotic development of his testimony, we do not find that the prosecutor's statement that she could not predict the content of Mr. Mitchell's testimony was a clear and obvious error. Mr. Garrett's challenge to the remark remains forfeited.

¶ 57    Second, Mr. Garrett challenges the State's question to Dr. Williams on cross-examination, "Are you familiar with the term 'snitches get stitches'?" Mr. Garrett argues that, in using the phrase "snitches get stitches," the State "furthered its improper and unfounded narrative" that Mr. Mitchell was threatened. He has made this argument in the context of setting forth his contention that the State engaged in prosecutorial misconduct in opening and closing remarks. He has made no argument that the State engaged in improper cross-examination and has not cited any authority on the topic.

¶ 58    Our supreme court has been clear that, "other than for assessing subject matter jurisdiction, 'a reviewing court should not normally search the record for unargued and unbriefed reasons to reverse a trial court's judgment.'" *People v. Givens*, 237 Ill. 2d 311, 323 (2010) (quoting *Saldana v. Wirtz Cartage Co.*, 74 Ill. 2d 379, 386 (1978)). Rather, reviewing courts are to follow the principle of "party presentation," as raising issues on behalf of a party would transform a reviewing court's role from that of jurist to that of advocate. *Id.* at 323-24. We follow *Givens* and decline to consider *sua sponte* the unbriefed, forfeited issue of whether the State engaged in improper cross-examination when it asked Dr. Williams if he was familiar with the term "snitches get stitches."

See *People v. Brown*, 2021 IL App (1st) 180991, ¶ 43 (declining to consider defendant's claim of error where it was unbriefed, and therefore, abandoned).

¶ 59    Third, Mr. Garrett challenges the trial court's overruling of his objection to the State's remark in closing that "despite what Lance Williams said, not many friends or same gang members want to come into court and testify against their own." He argues that the State's comment that not many gang members want to come to court and testify was unfounded in the evidence and, citing *People v. Potts*, 2021 IL App (1st) 161219, "simply not true." We do not agree.

¶ 60    In *Potts*, this court acknowledged that "day in and day out, gang members and other witnesses testify at criminal trials." *Id.* However, we also observed that "the fear of retaliation that witnesses in criminal trials may face *** is often very real and not at all misplaced," and that "gang members may fear retaliation if they testify against members of a rival gang, and even more so if they testify against members of their own." *Id.* ¶¶ 312-13. As such, *Potts* does not support Mr. Garrett's position.

¶ 61    At trial, Detective Kilroy, who was qualified by the court to testify in the field of criminal street gang investigations and intelligence, testified that gangs have rules, including one "pertaining to testifying in court against other gang members." Thus, the prosecutor's comment was not without a basis in the record. We find that the State's comment was a legitimate inference from the record, and it was not error for the trial court to overrule Mr. Garrett's objection to it. Regarding Mr. Garrett's forfeited claims, we find no clear or obvious error.

¶ 62    As no error occurred, Mr. Garrett's additional argument that counsel was ineffective for failing to make contemporaneous objections also lacks merit. Since the actions complained of did

not rise to the level of plain error, the failure of Mr. Garrett's trial counsel to preserve those claims did not prejudice him. *People v. Easley*, 192 Ill. 2d 307, 332 (2000).

¶ 63    We now move to Mr. Garrett's sole preserved claim of prosecutorial misconduct. Mr. Garrett challenges the State's comment in closing argument, "Do you know how hard it was for Dontrell Mitchell to climb those stairs to get onto the witness stand? It is like climbing Mount Everest." In light of Detective Kilroy's testimony that gangs have rules pertaining to testifying against fellow gang members, as well as this court's observations in *Potts* that gang members may face "very real and not at all misplaced" fear of retaliation if they do so (see *id.*), we find that the State's remark was a legitimate inference from the record. Under either standard of review, we find no reversible error.

¶ 64                                B. Excessive Sentence

¶ 65    Mr. Garrett's second contention on appeal is that his sentence of 55 years' imprisonment is excessive. However, his brief conflates two distinct issues. He argues the trial court abused its discretion while simultaneously asserting the court ordered an unconstitutional *de facto* life sentence. Therefore, we will interpret Mr. Garrett's sentencing argument as both an as-applied constitutional challenge as well as claim of abuse of discretion. See *People v. Elliot*, 2022 IL App (1st) 192294, ¶ 54 (where the defendant commingled two distinct issues, the court addressed both his as-applied constitutional challenge and abuse of discretion claim).

¶ 66    We first address the constitutional issue, which we review *de novo. People v. Vega*, 2018 IL App (1st) 160619, ¶ 52. Mr. Garrett argues that his 55-year term of imprisonment constitutes a *de facto* life sentence because he will not be released from prison until three days before his seventy-fifth birthday. A *de facto* life sentence constitutes a sentence that is the functional

equivalent to natural life without the possibility of parole. *People v. Reyes*, 2016 IL 119271, ¶ 9. When such a sentence is imposed on a juvenile without consideration of youth and its attendant mitigating factors, it is a violation of the eighth amendment's prohibition on cruel and unusual punishment. *Id.* A prison sentence of 40 years or less imposed on a juvenile offender does not constitute a *de facto* life sentence in violation of the eighth amendment. *People v. Buffer*, 2019 IL 122327, ¶ 41.

¶ 67 The concept of a *de facto* life sentence stemmed from the United States Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460, 472 (2012), which held that a mandatory term of life imprisonment without the possibility of parole may not be applied to a juvenile offender. *Elliott*, 2022 IL App (1st) 192294, ¶ 54. In particular, *Miller* explained that "children are constitutionally different from adults for purposes of sentencing," and held that the eighth amendment prohibition on cruel and unusual punishment requires that judges be afforded discretion to consider youth and its attendant mitigating circumstances when sentencing juvenile offenders. *Miller*, 567 U.S. at 471, 476.

¶ 68 Mr. Garrett, at 19 years old, was not a juvenile at the time of his offense and is therefore not afforded *Miller*'s eighth amendment protection. *People v. Harris*, 2018 IL 121932, ¶ 61. Though the Illinois Constitution's proportionate penalties clause (Ill. Const. 1970, art. I, § 11) may provide *Miller*-like protections as applied to a young adult, it is unnecessary to address them in this case. See *Elliott*, 2022 IL App (1st) 192294, ¶ 55. As Mr. Garrett was under 21 years of age on the date of the offense and was sentenced after June 1, 2019, he is eligible for parole after serving 20 years of his sentence. See 730 ILCS 5/5-4.5-115(b) (West 2022). Thus, his claim that his sentence is a *de facto* life sentence that requires him to be imprisoned until three days before

his seventy-fifth birthday is inaccurate. See *Elliott*, 2022 IL App (1st) 192294, ¶ 56 (defendant's sentence is not a *de facto* life sentence since he is eligible for parole).

¶ 69     We turn to whether the trial court abused its discretion in sentencing him to a term of 55 years' imprisonment. A trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference on review. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). Sentencing decisions are entitled to great deference on appeal because the trial court is in a superior position to fashion an appropriate sentence based on firsthand consideration of the relevant sentencing factors, such as the defendant's credibility, demeanor, moral character, mentality, social environment, habits, and age. *People v. Snyder*, 2011 IL 111382, ¶ 36. Although the trial court must consider mitigating factors, it has no obligation to recite each factor and the weight it is given. *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 11. Absent some indication to the contrary, other than the sentence itself, we presume the trial court properly considered all relevant mitigating factors presented. *People v. Kindle*, 2021 IL App (1st) 190484, ¶ 67.

¶ 70     In reviewing a defendant's sentence, this court will not reweigh the aggravating and mitigating factors and substitute our judgment for that of the trial court merely because we would have weighed these factors differently. *People v. Jones*, 2019 IL App (1st) 170478, ¶ 50. A sentencing determination will not be disturbed absent an abuse of discretion. *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000). Sentences within the permissible statutory range may be deemed to be the result of an abuse of discretion only where they are "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Id.* at 210.

¶ 71     In this case, the jury found Mr. Garrett guilty of first degree murder while personally discharging a firearm that proximately caused death. As such, he faced a sentencing range of 45

years to life in prison. 730 ILCS 5/5-4.5-20(a) (West 2016) (providing a range of 20 to 60 years' imprisonment for first degree murder); 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2016) (providing an add-on of 25 years to natural life as a mandatory firearm enhancement).

¶ 72    Mr. Garrett does not dispute that his sentence falls within the permissible sentencing range and is presumed proper. See *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 105 (where a trial court imposes a sentence within the permitted statutory range, there is a presumption that the sentence is proper). He also concedes that the trial court listed the "*Miller* factors" as among its considerations at sentencing, and that the trial court acknowledged the development of the brain continuing through the early 20s. However, Mr. Garrett argues that the court minimized the impact of these factors, did not properly consider his age and rehabilitative potential, and failed to devise a sentence with the objective of restoring him to useful citizenship.

¶ 73    The record demonstrates that the trial court was well aware of the mitigating factors identified by Mr. Garrett on appeal, several of which the court specifically mentioned at sentencing. The court noted that he was 19 years old at the time of the shooting, discussed brain development, and stated it had considered his family background and home environment. Specifically, the court noted that it had considered "presence of cognitive or developmental disability or both, if any, whether or not defendant was subjected to outside pressure including peer pressure, familial pressure or negative influence, the defendant's family, home environment, education and social background including any history of parental neglect, physical abuse or other childhood trauma, defendant's potential for rehabilitation or evidence of rehabilitation or both." The PSI report, which the court reviewed, reflected defendant's age, family support and relationships, and prior employment. As noted above, where, as here, mitigating factors are

presented, we may presume that the trial court properly considered them absent some indication to the contrary. See *Kindle*, 2021 IL App (1st) 190484, ¶ 67. We find no such indication here.

¶ 74    In addition to considering the evidence in mitigation, the trial court made clear at sentencing that it was mindful of the seriousness of the offense. It opined that Mr. Garrett's youth and corresponding level of brain development did not "explain jumping out of a car upon seeing someone that they don't like or have a beef with and shooting them over and over and following and running behind them shooting." The court also characterized the shooting as "cold blooded" and observed that, unlike in cases of self-defense or mutual combat, Mr. Garrett "didn't have to chase [Banks] and shoot[ ] him as he ran behind him constantly shooting." In denying Mr. Garrett's motion to reconsider sentence, the court expressly stated "I thought long about this sentence. I really believe when you look at that video and I think justice would approve of the sentence, 65 years or more[.]" The most important sentencing factor is the seriousness of the offense, and a trial court need not give greater weight to a defendant's rehabilitative potential or other mitigating factors than to the severity of the offense. *People v. Sandifer*, 2017 IL App (1st) 142740, ¶ 82. The trial court was entitled to weigh all of the factors in aggravation and mitigation. Mr. Garret's arguments on appeal amount to a request that we reweigh those factors, but we will not substitute our judgment for the trial court's simply because we may have weighed them differently. *Alexander*, 239 Ill. 2d at 213.

¶ 75    In light of the facts of this case, and the trial court's consideration of mitigating and aggravating factors, we cannot find that Mr. Garrett's sentence is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 210. Accordingly, we find no abuse of discretion.

¶ 76                          CONCLUSION

¶ 77     For the reasons explained above, we affirm the judgment of the circuit court.

¶ 78     Affirmed.