2024 IL App (1st) 230728-U

No. 1-23-0728

Order filed July 17, 2024

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 8443 |
| | ) | |
| DAVID BUSH, | ) | Honorable |
| | ) | Maria Kuriakos-Ciesil, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Reyes and Justice D.B. Walker concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm defendant's convictions for attempted armed robbery with a firearm and attempted first degree murder during which he personally discharged a firearm; vacate the sentences imposed on other counts of attempted first degree murder and aggravated battery pursuant to the one-act, one-crime doctrine; and reject defendant's procedurally defaulted contention that his aggregate sentence is excessive.

¶ 2   Following a jury trial, defendant David Bush was convicted of attempted first degree murder (count III) (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2014)), attempted first degree murder while

personally discharging a firearm (count V) (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2014)), aggravated battery (count X) (720 ILCS 5/12-3.05(e)(1) (West 2014)), and attempted armed robbery with a firearm (count XI) (720 ILCS 5/8-4(a), 18-2(a)(2)) (West 2014)). The trial court imposed three concurrent sentences of 26 years in prison on counts III, V, and X, and a consecutive sentence of 4 years in prison on count XI, for an aggregate sentence of 30 years in prison.

¶ 3 On appeal, defendant contends that (1) the State failed to prove beyond a reasonable doubt that he personally discharged a firearm; (2) his three convictions for the single charged act of shooting one victim violate the one-act, one-crime doctrine; and (3) his sentence is excessive. For the reasons that follow, we vacate defendant's sentences on counts III and X as violative of the one-act, one-crime doctrine, and affirm his convictions and sentences on counts V and XI.[1]

¶ 4 Defendant's convictions arose from an attack on an off-duty police officer by two assailants in the alley behind the officer's house on the 300 block of West 103rd Place in Chicago. Following arrest, defendant and another individual, Taiwan McNeal, were charged in a 21-count indictment with a range of crimes. Prior to trial, the court granted defendant's motion to sever his trial from McNeal's. McNeal is not a party to this appeal.

¶ 5 At trial, Oak Park police officer Johnny Patterson testified that on the morning of May 3, 2015, he prepared for work by dressing in his uniform pants, a t-shirt, and a Cubs jersey. He carried his loaded, off-duty .40-caliber firearm in a holster on his hip. About 5:10 a.m., he drove his vehicle from the front of his house to the alley, parked, and walked into his garage through the service

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

door to retrieve a protein shake from the refrigerator. Although the sun was not up yet, the area near the garage was "well-lit" by an alley light.

¶ 6 As Patterson exited the garage into the alley, he saw motion to his left. He turned and saw a person 20 to 25 feet away "come from behind a pole and start approaching *** with a weapon." In court, he identified this person as defendant. Defendant walked toward Patterson at a fast pace, pointing his weapon directly at Patterson's face. Patterson was at the driver's door of his vehicle and defendant walked to the bumper. Patterson said, "I am the police, I am the police."

¶ 7 A second man appeared and grabbed Patterson's sides and pockets, patting him down. Patterson glanced at the second man, but his focus was on defendant. The second man said, "He got something, shoot him, shoot him," at which point defendant opened fire. A bullet struck Patterson's right forearm, which he used to cover his face. Patterson moved, was shot in the left side, and pulled his own weapon and returned fire as he went to the ground. Patterson recalled firing his own weapon four times. Defendant fired more rounds, one of which struck Patterson's right calf. Defendant started to back up and fell. Although defendant had fallen, he was still firing. Patterson did not know whether he had hit defendant "until he was running away and he yelled to his partner, 'He shot me, he shot me.' " Defendant and the second man ran northbound through the alley toward 103rd Street.

¶ 8 Patterson testified that the firearm defendant used was "kind of large and dark colored." Patterson saw defendant's face as defendant approached, and nothing blocked Patterson's view. He described defendant as light complexioned with "nappy, wooly, long, dreadlock-type hair." He could not remember what defendant was wearing. He estimated that the entire incident lasted 90 seconds, "no more than 2 minutes."

¶ 9    After defendant and the other man fled, Patterson called his wife, who called 911. When the police arrived, he described his assailants along the lines of "two male blacks with nappy, wooly hair." Patterson was taken to the hospital for treatment of "through and through" gunshot wounds to his forearm, side, and calf. There, his sister-in-law, Monica McCoy-Eiland, showed him photographs on her phone. Patterson told her, "[Y]es, those are the two guys that shot me." Shortly thereafter, detectives showed him the same photographs and he confirmed that "those were the guys" who were involved in the shooting. Patterson remained hospitalized for four days and required surgery on his leg because the wound had become infected.

¶ 10    On cross-examination, Patterson stated that the alley light did not cast a shadow on defendant's face. He reiterated that he only "glimpsed" the second man because he was "looking at the person with the gun in front of me." Patterson estimated that defendant fired five or six shots, stated that defendant "was close up on me," and agreed that the incident was frightening. He clarified that he identified the two men in the photographs "within like an hour or so."

¶ 11    Clarence Covington, a bus operator for the Chicago Transit Authority, testified that around 5:10 a.m. on May 3, 2015, he was driving his route on 103rd Street when he heard gunshots. He then saw two men running north from an alley and across the street in front of him, about 1½ blocks west of Wentworth Avenue. Both men were wearing dark clothing; one had a hoodie on and the other had dreadlocks. One of the men was hobbling.

¶ 12    Covington continued his route to the end, turned around, and drove back toward Wentworth. When he arrived back at the alley, about 15 minutes after having seen the two men, he noticed police officers at the scene. Covington stopped and told the officers what he had seen.

¶ 13    Chicago police officer Leonid Shvartser testified that he was among the officers who responded to the scene. Around 5:30 a.m., after Patterson was taken away in an ambulance, Shvartser heard a dispatch that a 911 caller had reported receiving a call from someone "saying that they were shot and they were hiding out on the 9900 block of South Princeton." Shvartser and his partner drove to that location, about two minutes away, and were directed to a gangway between two houses. As Shvartser walked through the gangway, he saw two men crouching at the bottom of a stairwell. He directed them to stand and, when they did, he noticed one of them had been shot. In court, he identified that man as defendant.

¶ 14    Shvartser testified that, based on the proximity of the gangway to the scene of the shooting, Patterson's report that he had shot at his assailants, and the direction of the perpetrators' flight, he believed defendant and the other man were the "individuals who were suspected in that shooting." Shvartser and his partner detained defendant and the other man. Defendant did not have a weapon on him.

¶ 15    Chicago fire department paramedic Timothy Cosgrove testified that, about 5:50 a.m. on the morning in question, he responded to a dispatch call of a gunshot victim. When he arrived at the location, he saw defendant, whom he identified in court, sitting on the curb or the sidewalk. Defendant had multiple fresh gunshot wounds: entrance wounds to the left bicep and the left ankle, a graze wound in the lower right quadrant of the abdomen, and a gunshot wound to the front of his right thigh. Cosgrove and other paramedics provided treatment to control defendant's bleeding, after which he was transported to the hospital in an ambulance.

¶ 16    McCoy-Eiland testified that, about 6 a.m. on the day in question, she learned from her son, Devin White, that Patterson had been shot. She immediately went to the hospital to see him. While

she was in the waiting room, she received a text message from White with two photographs of two young men, one on a gurney and the other in handcuffs. When she saw Patterson, she showed him the photographs. Regarding the photograph of the young man on the gurney, Patterson spontaneously said, "[T]hat's the guy that shot me." She denied telling Patterson anything regarding the photographs. Police officers who were present took pictures of the photographs and returned her phone.

¶ 17    White testified that, on the day in question, he learned from McCoy-Eiland that Patterson had been shot. Sometime later, he sent McCoy-Eiland photographs "of the alleged attack of [his] uncle" via text message. He did not remember where he had gotten the photographs from, but agreed it was "fair to say" that he had received them from a family member.

¶ 18    Chicago police detective Patrick Hackett testified that he interviewed Patterson at the hospital. Patterson informed Hackett that he had already identified his shooter. Hackett then spoke with McCoy-Eiland and took her cell phone. He showed the photographs of the two men on McCoy-Eiland's phone to Patterson, who identified the one depicted on the gurney as his shooter, and the other as the man who accompanied the shooter. On cross-examination, Hackett agreed that, in the photograph depicting defendant on a gurney, there were two police officers around him.

¶ 19    Chicago police sergeant Kevin Winstead testified that he was one of several officers who searched for evidence that may have been discarded by the offenders between the area of the shooting and location where they were arrested. During the search, Winstead noticed a garage with an open side door. He stepped inside and immediately observed a handgun on the floor. He stayed with the handgun until an evidence technician recovered it.

¶ 20   Chicago police detective Brian Casey testified that he and other officers searched the area north of Patterson's garage because Patterson and Covington had seen the offenders flee in that direction. The firearm found by Winstead was in a detached garage approximately one block from Patterson's garage and three blocks from where defendant was arrested, along a "straight line" between the two points.

¶ 21   Alex Aranowski, a Chicago police evidence technician, testified that, in the alley behind Patterson's garage, he recovered seven .45-caliber fired cartridge cases and five .40-caliber fired cartridge cases. He also recovered a fired bullet from inside Patterson's garage and an unspecified number of "fired bullet fragments" from unspecified locations at the scene. In addition, he recovered a .45-caliber handgun from inside a garage about a block north of Patterson's house. At the hospital, he recovered defendant's shoes. Upon inspection, Aranowski discovered two fired bullet fragments in the heel of the left shoe, which he extracted.

¶ 22   The State introduced forensic evidence via witnesses and stipulations. The evidence showed that a mixture of four individuals' DNA was present on the .45-caliber handgun recovered from the garage, but that neither defendant nor McNeal was a contributor. The five .40-caliber cartridge cases recovered from the alley were fired from Patterson's firearm, and the seven .45-caliber cartridge cases recovered from the alley were fired from the handgun recovered from the garage. One of the bullet fragments extracted from defendant's shoe was fired by the handgun recovered from the garage, and testing was inconclusive as to whether the second, smaller fragment was fired by that handgun or Patterson's firearm. Defendant's hands tested negative for gunshot residue and there were no latent fingerprints suitable for comparison on any of the items examined for such prints.

¶ 23     During deliberations, the jury requested transcripts of Patterson's and Detective Casey's testimony, and asked whether they could find defendant guilty of attempted first degree murder without finding that he personally discharged a firearm. The trial court provided the transcripts, but advised the jury that instructions had been provided and they should continue to deliberate.

¶ 24     The jury found defendant guilty of attempted first degree murder (finding that he personally discharged a firearm during the commission of the offense), aggravated battery, and attempted armed robbery.

¶ 25     Defendant filed a motion for a new trial, which the trial court denied.

¶ 26     At sentencing, the State provided a victim impact statement prepared by Patterson, in which he discussed the physical and financial hardships he had endured as a result of the shooting, as well as his family members' loss of a sense of comfort in their home.

¶ 27     The trial court had possession of an original and an amended presentence investigation (PSI) report, to which defense counsel made corrections. The amended PSI report reflected that defendant's criminal history included a juvenile adjudication for aggravated unlawful use of a weapon, for which he was sentenced to 30 months of probation. That probation was terminated unsatisfactorily after he violated probation by failing to go to school, violating home confinement, and missing probation appointments, and then he failed to appear in court on the violation of probation. In addition, defendant had juvenile adjudications for aggravated possession of a stolen motor vehicle, for which he received a sentence of probation, and for aggravated battery of an employee of the Cook County juvenile temporary detention center, for which he received an "unknown" disposition. As an adult, defendant was convicted of aggravated battery of a peace officer resulting in great bodily harm and received a sentence of "IDOC 10 YRS."

¶ 28    The PSI report reflected that defendant reported an "alright" relationship with his mother, a good relationship with his siblings, and "a good childhood." However, he did not feel safe in the neighborhood where he grew up, which was "very violent," and he reported having been shot and stabbed in the past. He completed eleventh grade despite being suspended and expelled from schools for fighting. He had one child and reported a good relationship with his nuclear family. Defendant self-reported that he had been prescribed psychotropic medication for mental health diagnoses, and that he had a "problem" with alcohol and illegal drugs and had spent 30 days in a treatment program while incarcerated.

¶ 29    The State argued numerous factors in aggravation. In mitigation, defense counsel argued that defendant was only 17 years old at the time of the shooting, had the support of his mother and his significant other, had a young child, and suffered from mental health issues and drug and alcohol abuse. Counsel also argued that the court should not impose a firearm enhancement that was discretionary due to defendant's age, and reviewed nine statutory factors the court was to consider in deciding whether the enhancement should be applied.

¶ 30    The trial court made a finding of severe bodily injury, based on Patterson having suffered three "through and through" gunshot wounds. The trial court indicated that it had listened to the arguments in aggravation and mitigation, had reviewed the original and amended PSI reports, and considered "all the factors of aggravation and mitigation." It specifically noted that it considered that defendant was 17 years old at the time of the shooting and his brain development "was still very young." The court also noted that defendant had "faced [a] gun charge" as a juvenile and violated the probation he had received as a result of that charge by failing to go to school and missing probation appointments. The court observed that defendant had failed to appear in court

on that violation of probation, characterizing that action as "sticking your nose up at authority." Further, the court noted that defendant subsequently received probation for aggravated possession of a stolen motor vehicle, and had again had the probation terminated unsatisfactorily.

¶ 31    The trial court imposed a 20-year firearm enhancement that was discretionary due to defendant having been under age 18 at the time of the crime, stating:

> "I cannot look away and make an excuse that you were just 17. I have to look at you as a whole. And when I see that prior background and I see that gun in your hand and I see the path that you could have taken had you followed through with probation and you chose not to and then you put yourself with a gun in your hand in this case, firing at another human being, I can't just say, no, he's going to get a pass for the firearms enhancement. So I find that there is a firearms enhancement."

¶ 32    The court explained that "the minimum is six years, but with the firearms enhancement, it becomes 26 years." The trial court imposed three concurrent sentences of 26 years in prison on count III (attempted first degree murder), count V (attempted first degree murder while personally discharging a firearm), and count X (aggravated battery), and a consecutive sentence of 4 years in prison on count XI (attempted armed robbery with a firearm), for an aggregate sentence of 30 years in prison. Defendant did not file a post-sentencing motion.

¶ 33    On appeal, defendant first contends that the State failed to prove beyond a reasonable doubt that he, and not McNeal, personally discharged a firearm during the commission of attempted first degree murder. He argues that he made no inculpatory statement, no DNA, fingerprint, or gunshot residue tied him to the handgun recovered from the garage, and Patterson's description of the shooter was "weak and conflicting." Defendant acknowledges that Patterson identified him as the

shooter in court, but asserts that Patterson had been under stress during the short, 90-second encounter, and that his description of the shooter as light complexioned with "nappy, wooly, long, dreadlock-type hair" was vague. Defendant suggests that his own gunshot wounds were caused by McNeal shooting him during "the chaos," by Patterson aiming at McNeal but hitting him instead, or by both. Finally, noting that one of the bullet fragments extracted from his shoe was fired from the handgun recovered from the garage, he argues that it is more likely that McNeal shot him than that he shot himself in the heel.

¶ 34    When reviewing the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). The credibility of the witnesses, the weight to be given their testimony, and the resolution of any conflicts in the evidence are within the province of the trier of fact, and a reviewing court will not substitute its judgment for that of the trier of fact on these matters. *People v. Brooks*, 187 Ill. 2d 91, 131 (1999). The testimony of a single witness, if positive and credible, is sufficient to convict. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). Reversal is justified only where the evidence is "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to the defendant's guilt. *People v. Slim*, 127 Ill. 2d 302, 307 (1989).

¶ 35    To assess identification testimony, this court applies factors set out by the United States Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). *People v. Branch*, 2018 IL App (1st) 150026, ¶ 25. Those factors are: (1) the opportunity that the witness had to view the offender at the time of the offense; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the offender; (4) the level of certainty demonstrated by the witness at the

identification; and (5) the length of time between the crime and the identification. *Id.* We find that the majority of the five *Biggers* factors favor the State in this case.

¶ 36    First, Patterson had sufficient opportunity to observe the shooter at the time of the offense. At trial, Patterson testified that defendant walked toward him in the alley, which was well-lit. Nothing obstructed Patterson's view of defendant's face, and the alley light did not cast a shadow on defendant's face. When defendant opened fire, Patterson was at the driver's door of his vehicle and defendant was at the bumper. While the encounter Patterson described may have been brief—about 90 seconds and no more than 2 minutes—the brevity of a witness's observation does not undermine his identification testimony. *People v. Barnes*, 364 Ill. App. 3d 888, 894 (2006).

¶ 37    As to the second factor, degree of attention, we disagree with defendant's assertion that Patterson's identification was unreliable due to the shooting having been stressful. Patterson testified that he focused on defendant while defendant approached from 20 to 25 feet away, and that he only "glimpsed" the second man. These circumstances demonstrate that Patterson's attention was focused, rather than distracted. Moreover, Patterson gave a detailed description of the entire incident, which indicates a high degree of attention. See *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 33.

¶ 38    Third, defendant does not argue that Patterson's description of him as having a light complexion and "nappy, wooly, long, dreadlock-type hair" was inaccurate. Rather, he asserts only that this description was vague. The vagueness of a description of an offender does not defeat an identification, as our supreme court has held that a general description of an offender may nevertheless be found sufficient. *Slim*, 127 Ill. 2d at 309. Where Patterson's description is not alleged to be inaccurate, this factor weighs in the State's favor.

¶ 39    The fourth *Biggers* factor is the level of certainty demonstrated by the witness at the identification. Patterson did not specifically testify as to how certain he was in his identification. On the other hand, when McCoy-Eiland showed him defendant's photograph, he immediately identified defendant. Patterson also never wavered in his identification. In these circumstances, we find that the fourth factor is neutral.

¶ 40    Fifth, Patterson testified that he identified defendant "within like an hour or so." This short time lapse weighs in favor of the State. See, *e.g.*, *People v. Malone*, 2012 IL App (1st) 110517, ¶ 36 (period of 16 months between offense and witness's initial identification of the offender did not render identification unreliable).

¶ 41    Finally, no DNA, fingerprint, or gunshot residue tied defendant to the crime. Nevertheless, where, as here, eyewitness testimony is sufficient to support a conviction, the State is not required to present such physical evidence in order to prove a defendant discharged a firearm. See *People v. Daheya*, 2013 IL App (1st) 122333, ¶¶ 75-76. Moreover, the fact that the bullet fragment extracted from defendant's shoe was fired by the firearm recovered from the garage does not defeat Patterson's identification of defendant as the shooter. Patterson testified that defendant, while shooting, started to back up, fell, and continued to fire. As such, it is not impossible that defendant shot his own shoe.

¶ 42    Where the majority of the *Biggers* factors weigh in favor of the State, we do not find Patterson's identification "so unsatisfactory, improbable or implausible" as to create a reasonable doubt as to defendant's guilt. *Slim*, 127 Ill. 2d at 307. Defendant's challenge to the sufficiency of the evidence fails.

¶ 43    Next, defendant contends that his convictions on count III (attempted first degree murder), count V (attempted first degree murder while personally discharging a firearm), and count X (aggravated battery) for one single charged act of shooting violate the one-act, one-crime doctrine. He argues that this court should amend the mittimus to merge the convictions and sentences on count III and X, leaving a judgment for count V only. The State concedes the one-act, one-crime violation and agrees with defendant that count V should stand. We agree with the parties.

¶ 44    Although defendant failed to preserve this issue by objecting at trial and addressing it in a posttrial motion, one-act, one-crime violations are recognized under the second prong of the plain error rule. *People v. Smith*, 2019 IL 123901, ¶ 14; *People v. Harvey*, 211 Ill. 2d 368, 389 (2004) ("an alleged one-act, one-crime violation and the potential for a surplus conviction and sentence affects the integrity of the judicial process, thus satisfying the second prong of the plain error rule").

¶ 45    In *People v. King*, 66 Ill. 2d 551, 566 (1977), our supreme court held that a defendant may not be convicted of multiple offenses based on precisely the same physical act. Whether a violation of the one-act, one-crime rule has occurred is a question of law that is reviewed *de novo*. *People v. Smith*, 2019 IL 123901, ¶ 15. To determine whether a one-act, one-crime violation has occurred, courts must determine whether the defendant's conduct consisted of a single physical act or separate acts. *Id.* If the convictions were based upon the same physical act, the convictions for the less serious offenses must be vacated. *People v. Johnson*, 237 Ill. 2d 81, 97 (2010).

¶ 46    An "act," as defined in *King*, is "any overt or outward manifestation which will support a different offense." *King*, 66 Ill. 2d at 566. We look to the charging instrument to determine whether offenses are based on the same act. *People v. Kotero*, 2012 IL App (1st) 100951, ¶ 22. If an

indictment charges the defendant for a single course of conduct, even if multiple theories of culpability are presented, the trial court cannot convict the defendant for separate criminal acts. *People v. Crespo*, 203 Ill. 2d 335, 345 (2001).

¶ 47    Here, the State presented evidence at trial that defendant fired at least seven shots, hitting Patterson three times. However, the indictment did not apportion any of these shots into separate crimes. Instead, counts III, V, and X each alleged simply that defendant "shot" Patterson. Therefore, the convictions on those counts were based on the same physical act. See *People v. Guyton*, 2014 IL App (1st) 110450, ¶¶ 32-33 (where the State failed to apportion five shots in the indictment, so that each would form the basis of a separate offense, the defendant's multiple convictions violated the one-act, one-crime doctrine).

¶ 48    As noted above, when convictions violate the one-act, one-crime rule, the convictions for the less serious offenses must be vacated. *Johnson*, 237 Ill. 2d at 97. Here, the offenses alleged in counts III, V, and X are all Class X crimes. However, count V is the most serious count because it includes the allegation that defendant personally discharged a firearm, and thus carries a greater possible punishment than counts III and X. See 720 ILCS 5/8-4 (c)(1)(C) (West 2022). Where count V carries the greatest possible punishment, and given the parties' agreement and the interests of judicial economy, we vacate defendant's sentences on counts III and X.

¶ 49    The trial court's guilty findings on counts III and X will merge with the conviction for attempted first degree murder entered on count V. See 730 ILCS 5/5-1-12 (West 2022) (a conviction requires both a finding of guilt and a sentence); *People v. Gordon*, 378 Ill. App. 3d 626, 642 (2007) (where multiple convictions violated the one act, one crime rule, this court ordered correction of the mittimus to reflect a single conviction and merged the other counts). We order

the mittimus corrected to reflect convictions only on counts V (attempted first degree murder while personally discharging a firearm) and count XI (attempted armed robbery with a firearm).

¶ 50    Finally, defendant contends that his sentence is excessive. He asserts that an aggregate 30-year sentence, imposed for an offense he committed when he was 17, is excessive in light of his criminal record and his potential for rehabilitation. Defendant acknowledges that, where he failed to file a motion to reconsider sentence, he did not preserve this contention for appeal. Nevertheless, he asserts that we may reach the issue under either prong of the plain error doctrine.

¶ 51    The State responds, in part, that defendant cannot obtain sentencing relief because the court imposed the statutory minimum sentence. The State is incorrect. Pursuant to section 5-4.5-105(b) of the Unified Code of Corrections, because defendant was under age 18 at the time of the offense, the trial court, in its discretion, could have declined to impose any firearm enhancement in this case. 730 ILCS 5/5-4.5-105(b) (West 2022). As such, the sentence imposed by the trial court, which included a 20-year firearm enhancement, is not the minimum sentence allowed by law.

¶ 52    We turn to defendant's claim of plain error. The plain error doctrine is a narrow and limited exception to forfeiture. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). To obtain relief under this doctrine in the sentencing context, a defendant must show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing. *Id.* However, before addressing either prong, a defendant must first show that a clear or obvious error occurred. *Id.* If he fails to meet his burden, the procedural default will be honored. *Id.* Here, we find no clear or obvious error.

¶ 53    A trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference on review. *People v. Alexander*, 239 Ill. 2d 205, 212

(2010). The trial court is in a superior position to fashion an appropriate sentence based on firsthand consideration of the relevant sentencing factors, including the defendant's credibility, demeanor, moral character, mentality, social environment, habits, and age. *People v. Snyder*, 2011 IL 111382, ¶ 36. Although the trial court's consideration of mitigating factors is required, it has no obligation to recite each factor and the weight it is given. *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 11. Absent some indication to the contrary, other than the sentence itself, we presume the trial court properly considered all relevant mitigating factors presented. *People v. Kindle*, 2021 IL App (1st) 190484, ¶ 67.

¶ 54    In reviewing a defendant's sentence, this court will not reweigh the aggravating and mitigating factors and substitute our judgment for that of the trial court merely because we would have weighed these factors differently. *People v. Jones*, 2019 IL App (1st) 170478, ¶ 50. A sentencing determination will not be disturbed absent an abuse of discretion. *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000). Sentences that fall within the statutory range may be deemed to be the result of an abuse of discretion only where they are "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Id.* at 210.

¶ 55    In this case, we find that the trial court did not abuse its discretion in sentencing defendant to an aggregate term of 30 years' imprisonment.

¶ 56    The sentencing range for attempted first degree murder, a Class X felony, is 6 to 30 years' imprisonment. 720 ILCS 5/8-4(c)(1) (West 2022); 730 ILCS 5/5-4.5-25(a) (West 2022). In addition, where there is a finding that, during the attempt to commit first degree murder, a defendant personally discharged a firearm, he is subject to a consecutive addition of 20 years. 720 ILCS 5/8-4(c)(1)(C) (West 2022). As noted, this firearm enhancement is discretionary when the

defendant was under age 18 at the time of the offense. 730 ILCS 5/5-4.5-105(b) (West 2022). Thus, the applicable sentencing range for attempted first degree murder in this case was 6 to 50 years in prison.

¶ 57   Defendant also stands convicted of count XI, attempted armed robbery with a firearm. 720 ILCS 5/8-4(a), 18-2(a)(2) (West 2014). The sentencing range for attempted armed robbery, a Class 1 felony, is 4 to 15 years' imprisonment. 720 ILCS 5/8-4(c)(2) (West 2022); 730 ILCS 5/5-4.5-30(a) (West 2022).

¶ 58   Finally, at sentencing in the instant case, the trial court made a finding of severe bodily injury. This finding required that defendant's sentences for attempted first degree murder and attempted armed robbery run consecutively. 730 ILCS 5/5-8-4(d)(1) (West 2022). As such, defendant's aggregate sentencing range was 10 to 65 years in prison.

¶ 59   Because the aggregate 30-year sentence imposed in this case is within the statutory sentencing range, it is presumed proper. *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 105; *People v. Vega*, 2018 IL App (1st) 160619, ¶ 64 (where sentences for individual crimes each fall within the statutorily provided ranges and run consecutively, the resulting aggregate sentence also falls within the statutory range and is presumed proper). Defendant does not dispute that his sentence falls within the permissible sentencing range and is presumed proper. Rather, he argues that the aggregate sentence is excessive in light of his potential for rehabilitation, evidenced mostly by his age at the time of the offense, and in light of his criminal record, which consisted of juvenile adjudications and one adult offense committed when he was 17. He further argues that the trial court failed to consider his difficult upbringing, his mental health diagnoses, the characteristics of

youth identified in *Miller v. Alabama*, 567 U.S. 460 (2012), and that "there was no evidence he was the instigator of the crime" and thus he had "diminished culpability."

¶ 60     We note that defendant received the minimum available sentence for attempted first degree murder (6 years), and the minimum available sentence for attempted armed robbery (4 years), and that he makes no argument that the trial court erred in ordering those sentences to run consecutively based on a finding that Patterson suffered severe bodily injury. In essence, therefore—despite not presenting his contention as such—defendant is alleging that the trial court abused its discretion by imposing the discretionary 20-year firearm enhancement. See *People v. Cavazos*, 2023 IL App (2d) 220066, ¶ 74.

¶ 61     The record demonstrates that the trial court was well aware of the mitigating factors identified by defendant on appeal. The PSI report, which the trial court reviewed, reflected defendant's age, difficulties in school, mental health diagnoses, substance abuse, upbringing in a "very violent" neighborhood, and history of being shot and stabbed. Defense counsel argued in mitigation that defendant was only 17 years old at the time of the shooting, had the support of his mother and his significant other, had a young child, and suffered from mental health issues and drug and alcohol abuse. Moreover, in arguing against the discretionary firearm enhancement, defense counsel discussed each of the *Miller* factors, which are codified in section 5-4.5-105(a) of the Unified Code of Corrections. 730 ILCS 5/5-4.5-105(a)(1)-(9) (West 2022). As noted, where, as here, mitigating factors are presented, we may presume that the trial court properly considered them absent some indication to the contrary. See *Kindle*, 2021 IL App (1st) 190484, ¶ 67. We find no such indication here.

¶ 62    In this case, the trial court stated that it had listened to the arguments in aggravation and mitigation, had reviewed the original and amended PSI reports, and considered "all the factors of aggravation and mitigation." Relevant here, the court stated it had considered that defendant was 17 years old at the time of the shooting and that his brain development "was still very young." However, the court also reviewed defendant's history of repeatedly violating probation, characterizing his failure to appear in court on one of the violations as "sticking your nose up at authority." The court told defendant it was imposing the firearm enhancement because it could not "make an excuse that you were just 17." It stated that it had to look at him "as a whole," explaining that, where he had chosen not to follow through with probation and then "put [him]self with a gun in [his] hand in this case, firing at another human being," it could not let him "get a pass" for the firearm enhancement.

¶ 63    Given that the mitigating factors defendant raises on appeal were discussed in defendant's PSI report and defense counsel's arguments, defendant essentially asks us to reweigh the sentencing factors and substitute our judgment for that of the trial court. This we cannot do. See *Jones*, 2019 IL App (1st) 170478, ¶ 50 (a reviewing court must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently).

¶ 64    In summary, we cannot find that the trial court abused its discretion in imposing the discretionary firearm enhancement and sentencing defendant to an aggregate term of 30 years' imprisonment. The trial court did not commit a clear or obvious error in considering aggravating and mitigating factors. Having found no clear or obvious error, there can be no plain error and defendant's forfeiture must be honored. See *Hillier*, 237 Ill. 2d at 545.

¶ 65    For the reasons explained above, we affirm defendant's convictions and sentences on counts V and XI, and vacate the sentences on counts III and X. The trial court's guilty findings on counts III and X will merge with the conviction for attempted first degree murder entered on count V. We order the mittimus corrected to reflect convictions only on counts V and count XI.

¶ 66    Affirmed in part, vacated in part; mittimus corrected.